[Crim. No. 13802. In Bank. Jan. 4, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
WELDON LEE HATHCOCK, Defendant and Appellant.

600

**COUNSEL**

William A. Smith for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TOBRINER, J.**—After an initial mistrial defendant Weldon Lee Hathcock was convicted upon a jury verdict of two counts of first degree murder

(Pen. Code, § 187) and two counts of kidnaping (Pen. Code, § 207). A separate jury thereafter set the penalty for each of the two counts of murder at death. (Pen. Code, § 190.) The case is now before us on an automatic appeal. (Pen. Code, § 1239, subd. (b).) For the reasons discussed below, we affirm the judgment as modified to provide for a punishment of life imprisonment rather than death.

This criminal proceeding arises from the deaths of Al Owens and Barbara Simon, which occurred during the late evening of Wednesday, January 31, 1968, and early morning of Thursday, February 1 in Fresno and Madera Counties. Witnesses for both the prosecution and the defense generally concurred in the following description of events preceding the deaths of the two victims.

Early on that Wednesday evening defendant and his wife Kathryn, at home with their three children, received a telephone call from a friend, Bruce Wisner. Wisner told the Hathcocks that he was at the Oasis Bar and was in trouble; he asked defendant to bring him a gun. Wisner had apparently been involved in a fight at the bar earlier in the evening. In response to Wisner's call, defendant's wife Kathryn placed a .45 caliber automatic handgun in her purse, and defendant and Kathryn drove to the Oasis Bar.[1]

Upon their arrival at the bar, Kathryn gave the gun to Wisner. A fight immediately broke out between Wisner and another patron, which defendant broke up by taking the gun away from Wisner. After defendant, Wisner, and Kathryn had had a drink, the Hathcocks persuaded Wisner to leave the bar; they all returned to the bar after a few minutes, however, met Al Owens, and then all four went to the Wisner home on Pine Street in Fresno. Defendant and his wife had apparently not been acquainted with Owens prior to that evening; Wisner had met him on one previous occasion.

Soon after the arrival of the four at the Wisner residence, Joe Hamilton, a friend of defendant and Wisner, arrived; a few minutes later Barbara Simon, an acquaintance of Al Owens, joined the gathering at the Wisners'. All of the company was apparently drinking somewhat, and there was testimony—denied by defendant—that defendant and Wisner were taking pills, "reds," throughout the evening. Several minutes thereafter, a fight erupted between Hamilton and Owens, apparently after Owens had called Hamilton an "S.O.B." Wisner and defendant broke up the fight.

The essential conflict between the prosecution and defense versions of

---

[1]The ownership of this gun, later shown to be the murder weapon, was disputed; defendant and Kathryn claimed it was Wisner's, and Wisner testified it belonged to defendant.

that evening's events begins at this point in time. Defendant testified that after the fight he first attempted to help Owens to his feet and then decided to go home because he was feeling rather ill and believed he had the flu. Defendant stated that he left the Wisner house by himself—Kathryn remained to help "clean up"—and he went directly home, arriving at his house between 10:30 and 11 p.m. He declared that he knew nothing about the activities of the other people at the house during the remainder of the evening.

Hamilton, Wisner, and Kathryn Hathcock all testified for the prosecution to a substantially different chain of events. All three recounted that after the fight between Hamilton and Owens had been curtailed, the defendant walked over to where Owens was seated in the living room, remarked to Hamilton, "That's no way to whip a man," and then struck Owens on the head with the butt of a handgun. Hamilton testified that after Owens fell to the floor from the blow to his head, defendant stomped on Owens several times. Wisner then dragged Owens into the kitchen and advised Hamilton to leave the house. Hamilton left.

The bulk of the prosecution's case against defendant was based on the testimony of Kathryn Hathcock and Wisner as to the events following Hamilton's departure. The two[2] testified that Owens, though seriously injured from the beating, was still alive at this time, and Wisner and defendant walked him out of the house. Kathryn and Barbara Simon were instructed to clean up the blood in the living room and kitchen; in addition, Kathryn testified that Wisner left a semi-automatic rifle by the kitchen door and instructed her to use the gun on Barbara if she tried to leave.

Wisner alone testified to the subsequent events leading to the actual killing of Owens. Wisner stated that outside the house defendant had declared, "[h]e didn't want Al to creep on him any more, so we would

---

[2]At the retrial Kathryn was a very reluctant prosecution witness and various aspects of her testimony form the subject of several specific claims of error that are discussed *infra*. In brief, much of Kathryn's testimony, to be related in text, was elicited by the prosecutor only after he had read to her portions of the testimony she had given in the initial trial and passages from a statement she had made to the prosecutor prior to any trial proceedings. Throughout her testimony she only begrudgingly conceded she had made such prior statements. On cross-examination, when asked to repudiate this prior testimony linking defendant with the crime, she implied that her prior statements were untrue, but rather than specifically supporting defendant's account, Kathryn exercised her Fifth Amendment privilege, ostensibly on the grounds that truthful answers would subject her to a charge of perjury. Kathryn's testimony against defendant, recounted above, thus stands unrepudiated, although this background of equivocation may cast some doubt on its veracity.

take him for a ride, take him somewhere."[3] Both men opened the trunk of Barbara Simon's car, put Owens in, and then, with defendant driving, drove out Palm Street to a location near the intersection of Palm and Hearndon. Wisner testified that at this time "we were both drinking pretty heavy." They pulled off the road, opened the trunk and both got Owens out of the car. Wisner stated that the defendant then instructed him to get back into the car and he did so. Wisner testified he thereafter heard a number of shots, and defendant returned to the car alone; Wisner did not see the actual shooting. After entering the car, defendant put another clip of cartridges into the gun.

During the drive back to Wisner's house, as the two continued their drinking, defendant asked Wisner if he knew "the Simon girl"; when Wisner replied that he did not, defendant allegedly remarked that "she would have to go too." Wisner and Kathryn testified that when the defendant and Wisner returned to the Wisner residence, it was decided that the two men and two women—Kathryn and Barbara—would drive up to "a cabin."[4] The four got into the Hathcock car, defendant and Wisner in the back seat, and, initially, Kathryn and Barbara in the front.

Kathryn drove as Wisner and defendant gave directions. On several occasions Barbara apparently requested that the car be stopped so that she could leave; both Wisner and defendant told Kathryn to keep driving. At some time during the drive, Wisner instructed Barbara to join the two men in the back seat and, as Kathryn continued to drive, the three allegedly engaged in some sexual activities. When they reached a ranch fence located at Highway 41 and Road 406 in Madera County, defendant instructed Kathryn to stop the car.

Kathryn testified that all four then got out of the car and that Wisner and the defendant walked with Barbara Simon back to the fence; Kathryn stated that she remained with the car. Immediately thereafter Kathryn stated she heard several shots, Wisner and defendant returned to the car without Barbara, and the three drove away from the scene of the shooting.

---

[3] Although this testimony by Wisner would appear to be most critical, in that it is the only hint in the record as to a motive for the murders, its meaning remains obscure. The language of Wisner's recollection would seem to imply that Owens had "creeped" on defendant on some prior occasion, but the evidence at trial revealed that defendant had never met nor known anything about Owens prior to the night that he died. In his closing argument the prosecutor interpreted Wisner's remark to mean that defendant did not want Owens to "creep up" on him in the future in retaliation for the pistol-whipping that defendant had just delivered.

[4] The reference to "a cabin" was apparently just part of the plan to kidnap and kill Barbara Simon. Neither the Hathcocks nor Wisner owned or had access to any cabin in the vicinity.

Wisner's version of the events at the scene of the second shooting varied from Kathryn's in that he testified that only defendant walked with Barbara Simon to the fence; Wisner claimed he followed defendant's instructions to get back into the car prior to any shooting. He stated that he then heard several shots, defendant returned without Barbara and the three drove off.

Both the murder weapon and Barbara Simon's purse were thrown from the car as the three returned to Fresno where Wisner purchased a can of gasoline. The three then took Barbara Simon's car out to the country, and, using the gasoline, ignited the car. They all returned to the Hathcock's home in Fresno, and defendant allegedly fell asleep immediately. Later that night Wisner and Kathryn burned some bloodstained clothing and other potentially incriminating items, including defendant's shoes. A day or two later, upon Kathryn and defendant's request, Paul Wolfe, Kathryn's brother, burned the tires of the car that the Hathcocks had driven on the night of the killings, and replaced them with newly purchased tires.

Defendant, Wisner, and Kathryn were all arrested on February 4, 1968, only a few days after the killings. At their initial arraignment before the Fresno Municipal Court on February 7, 1968, all three were charged with two counts of murder and two counts of kidnaping. One retained attorney, George Carter, represented all three defendants at the arraignment. The court advised the present defendant of his constitutional right of representation by counsel, but did not give any advice with respect to the availability of separate counsel. At the preliminary hearing in the Fresno Municipal Court on March 5 and 6, 1968, Mr. Carter again appeared for all three defendants. Upon the conclusion of this preliminary hearing, the court found the evidence against Kathryn insufficient to warrant further proceedings and dismissed the charges against her, but ordered that the defendant and Wisner be held to answer before the superior court.

Defendant and Wisner were arraigned in the Fresno County Superior Court on March 29, 1968, upon an information charging each with the same offenses enumerated in the municipal court complaint. Both defendants were still represented by a single attorney, Mr. Carter. One month later, on April 30, 1968, Carter withdrew as defendant's attorney of record and defendant's present counsel, Mr. Smith, was substituted; Carter continued to represent both Wisner and Kathryn.

Within a week of this change of counsel, on May 7, 1968, both Wisner and Kathryn, upon advice of their attorney, gave full inculpatory statements to the prosecution, detailing the defendant's role in the crimes.

Wisner's confession was obtained in return for the prosecution's agreement not to seek the death penalty against him. Thereafter Wisner pleaded guilty to one count of first degree murder and, upon recommendation of the prosecutor, was sentenced to life imprisonment. The remaining three counts of the information were dismissed upon motion of the district attorney. To obtain Kathryn's statement, the prosecution offered her immunity from prosecution for any crimes relating to the events of January 31 and February 1. As we have seen, the testimony of these two witnesses at trial provided an important part of the prosecution's case against defendant.

The first jury trial commenced on July 22, 1968, in the Fresno County Superior Court. After the prosecution had completed the initial presentation of its case, the prosecutor, during cross-examination of a defense witness, interposed an allegation that defendant was involved in the business of prostitution.[5] Defendant's counsel objected vigorously, asked the court to cite the prosecutor for misconduct, and moved for a mistrial; the court took the motion under advisement. Thereafter, on cross-examination of defendant, the prosecutor elicited, over objection, the fact that defendant had been convicted, 14 years earlier, of two felonies—pimping and pandering. The prosecutor followed this line of questioning by asking: "Isn't it a fact that Barbara Simon was killed because she was not a trusted member of your statewide prostitution ring?" This evoked another vigorous objection and a renewal of the motion for declaration of a mistrial, which the court again took under advisement. The trial court advised the prosecution at this time that he expected convincing proof of the allegations. On August 5, 1968, after both the People and the defendant had rested their case, defendant renewed his motion for a mistrial, and the trial court at this time granted the motion.

A week later, on August 13, 1968, defendant moved for a change of venue, contending that the widespread publicity of his former trial—in particular the publication of the highly prejudicial accusations of the prosecutor—presented the probability that he would not receive a fair trial by an impartial jury in Fresno County. The court denied this initial change of venue motion on August 15, 1968, and also denied a subsequent change of venue motion on September 13, 1968.

Thereafter, defendant moved for a dismissal of the charges against him on the ground that he had already been placed in jeopardy once by virtue of his initial trial; defendant claimed that since the mistrial resulted from "blatant" prosecutorial misconduct, the constitutional "double jeopardy" prohibition barred further prosecution, notwithstanding the fact that defend-

---

[5]The district attorney asked James Clay: "Is it correct that you were associated with the defendant in the prostitution business?"

ant himself had sought the mistrial order. This contention was rejected by the trial court, and on October 7, 1968, the Court of Appeal declined to issue a writ of prohibition upon defendant's application.[6]

Defendant's new jury trial began on October 14, 1968, again in the Fresno County Superior Court. On October 31, 1968, the jury returned a verdict finding defendant guilty on the two counts of murder and the two counts of kidnaping charged in the information; the jury fixed the degree of the two murder counts at first degree. Thereafter, in excusing the jury for the day, the trial court neglected fully to caution the jurors against discussing the case outside the courtroom. This omission was brought to the attention of the court on November 6, 1968, when the jury reconvened for the commencement of the penalty trial and, upon motion of defendant and over the objection of the prosecution, the trial judge dismissed the jury from service and ordered a new jury panel convened to hear the penalty phase.

On December 2, 1968, the penalty trial commenced before a new jury panel. Because the new panel had not been present at the guilt phase, much of the prosecution's presentation at the penalty phase consisted of a reintroduction of the evidence adduced at the prior guilt trial. In addition the prosecutor presented evidence of a number of earlier incidents in which the defendant had brutally assaulted other individuals, as evidence in aggravation of the penalty. The defendant's case at the penalty phase consisted primarily of the testimony of character witnesses, who testified that defendant was not prone to violent acts. Defendant did not testify on his own behalf at the penalty trial. On December 19, 1968, the penalty phase jury fixed the sentence for both counts of murder at death.

Defendant now appeals from the judgment of conviction and the sentences imposed by the jury, raising a host of specific contentions of error. As discussed below, we have concluded that only one of these contentions—that capital punishment is unconstitutional as cruel and unusual punishment—has merit, and we therefore affirm the judgment as modified to provide for a punishment of life imprisonment instead of death.

1. *Defendant's references to various instances of the prosecutor's behavior fail to substantiate his contention of prejudicial prosecutorial misconduct.*

Defendant initially contends that his second guilt trial was prejudicially tainted by a series of improper prosecutorial comments which in sum

---

[6]At the same time the Court of Appeal also refused to issue a writ of prohibition with respect to defendant's change of venue contention.

allegedly implied that defendant was a "gangster," engaged in the business of operating a prostitution ring. Defendant claims that although the prosecutor did not engage in the type of blatant accusation that resulted in the initial mistrial,[7] the district attorney in effect disclosed the same improper accusation through a more subtle approach of aptly timed insinuations. Defendant isolates a series of prosecution examination tactics which, defendant concedes, appear either quite innocent or of only minimal significance on their face; defendant argues that taken together, however, they illustrate conclusively the improper prosecutorial purpose that motivated all the incidents. We do not agree.

The individual instances of alleged misconduct specified by defendant—20 in all—occurred at various times throughout both the prosecution and defense cases and opening and closing arguments; defendant objected to only five of these occurrences at trial, and his objections were sustained as to four of these prosecutorial comments.[8] In general, "[m]isconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury." (*People* v. *Varnum* (1969) 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553]; see *People* v. *Lyons* (1958) 50 Cal.2d 245, 262 [324 P.2d

---

[7]At the first trial, it will be recalled, the prosecutor explicitly inquired of defendant: "Isn't it a fact that Barbara Simon was killed because she was not a trusted member of your statewide prostitution ring?"

[8]The sole objection of defendant overruled by the trial court involved the admission of a semi-automatic, submachine gun into evidence. Although the gun was not involved in either of the killings, it was present at the Wisner house during the evening of January 31, and Kathryn testified that when defendant and Wisner left with Owens, Wisner had instructed her to use the gun to assure that Barbara Simon did not leave the house; in this respect it was relevant evidence to show the state of mind of one of the alleged co-perpetrators of the crimes. Defendant contends that even if relevant the gun should have been excluded under Evidence Code section 352, on the ground that its prejudicial and inflammatory effect outweighed its probative value. (Cf. *People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65].) This objection was raised before the trial court, and the judge, exercising his discretion, rejected the contention that the presentation of the weapon would be unduly prejudicial; under the circumstances the court did not abuse its discretion. (*People* v. *Goodridge* (1969) 70 Cal.2d 824, 836-837 [76 Cal.Rptr. 421, 452 P.2d 637].) Although defendant contends that the introduction of this type of weapon tended to stigmatize defendant as a "gangster-type," the weapon in fact belonged to Wisner and was so identified at trial. Furthermore, under questioning by defendant's counsel on cross-examination, Wisner admitted that he had many guns around his house and that he very often discharged them in the house. It does not appear that the introduction of this semi-automatic, submachine gun could reasonably have prejudiced the defendant.

556].) Although defendant contends that inferences arising from the alleged misconduct contributed materially to his conviction, after examination of the complete transcript, we do not believe that the designated instances of "misconduct" could have had the prejudicial impact that defendant ascribes to them.

The challenged comments range from a reference to the fact that defendant wears a glove on only one hand (impliedly his "gun hand"?) to statements revealing the nicknames of two women, purportedly friends of the defendant's wife, but allegedly actually prostitutes working for defendant.[9] Although some of the allegedly improper comments—for example, references to the defendant's inordinate control over his wife (an alleged implication that she also worked for him as a prostitute) or to the defendant's possession of large amounts of cash—could conceivably bolster a preformed belief that defendant was presently engaged in some illegal prostitution operation, the comments in themselves give no indication of such a practice and are more susceptible to an innocent interpretation. None of the prosecutorial comments challenged as misconduct explicitly mention "prostitution" or "gangsterism" and though defendant may attribute this to the subtlety of the prosecutor, we believe that the sum of all the claimed misconduct did not, by itself, suggest the inferences drawn by the defendant.

We do not believe it necessary to recount each individual incident of purported misconduct;[10] it suffices to state that defendant presents no

---

[9]The women's names are Darlene Sutherland and Pauline Calpito; their nicknames, as disclosed by the defendant on cross-examination, are "Curly" and "Paul." It is difficult to discern in what manner the revelation of these nicknames either betrays the women's calling or illustrates the defendant's relationship with the two women.

[10]Three additional examples will serve to illustrate the general tenor of defendant's arguments.

(1) On cross-examination of a defense witness, the prosecutor asked whether the witness's testimony was the result of his fear that defendant's brother would retaliate if the witness did not so testify. Defendant maintains that the question gives rise to an improper inference of family retaliation by violence, a trait which adds to the "gangster" image of defendant. Although such an interpretation is a conceivable one, the question itself properly addresses the possible bias of the witness; the possible inference which defendant draws is not clearly nor even strongly suggested by the question's terms.

(2) In opening argument the prosecution declared that one of the prosecution's witnesses had moved away from Fresno "out of fear of the defendant and his associates." Although defendant properly objects to the use of the expression "and his associates," since no proof relating to such associates or their intimidating action was ever introduced at trial, the error does not rise to the level of importance that defendant attributes to it. On cross-examination of the witness in question, witness conceded that there had been no overt threats, and there was no further men-

evidence that the prosecutor intentionally made these comments for the improper purpose of showing defendant's complicity in an illegal operation or to stigmatize defendant as a "gangster," and that the occurrences, taken as a whole, do not rise to the level of prejudicial misconduct. (Cf. *People v. Sweeney* (1960) 55 Cal.2d 27, 45-48 [9 Cal.Rptr. 793, 357 P.2d 1049]; *People v. Lyons* (1958) 50 Cal.2d 245, 262-265 [324 P.2d 556]; *People v. Coke* (1964) 230 Cal.App.2d 22, 29-30 [40 Cal.Rptr. 649]; *People v. Ramsey* (1962) 202 Cal.App.2d 856, 860-861 [21 Cal.Rptr. 406].)

2. *The trial court did not err in refusing to exclude evidence of defendant's prior convictions.*

After defendant testified on his own behalf, the prosecutor on cross-examination sought to have defendant reveal his prior felony convictions, ostensibly for the purpose of impeachment. Defendant objected to the eliciting of this evidence on the grounds that the potential prejudicial effect of such testimony would greatly outweigh any possible probative value. The court, relying on the settled law at the time of trial (see *People v. Kelly* (1968) 261 Cal.App.2d 708, 712-713 [68 Cal.Rptr. 337]), over-ruled defendant's objection and required the defendant to disclose his past felony record without weighing its potential prejudice or probative value. Defendant now contends that in so doing the trial court committed prejudicial error.

Defendant's trial was conducted in October 1968. On January 5, 1972, this court held in *People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], that under section 352 of the Evidence Code trial courts may exercise discretion to exclude a prior felony conviction if the prejudicial effect of such evidence outweighs its potential probative value. In reaching this conclusion, however, our court disapproved a long line of contrary Court of Appeal cases which had held that a trial judge had no discretion to exclude evidence of a prior felony conviction when the law-

---

tion of "associates." The support that this passing reference adds to the "gangster" characterization is de minimus.

(3) While ostensibly impeaching Kathryn Hathcock by reference to a prior inconsistent statement, the prosecution went beyond permissible impeachment by relating a prior statement of Kathryn's indicating that two of Kathryn's "friends" (impliedly prostitutes controlled by defendant?) often stayed in motels in Indio, a town near several labor camps. Although this element of the statement clearly was not proper as impeachment, defendant failed to object to its introduction. Moreover, while from hindsight this instance may seem to raise some suspicion concerning the prosecutor's motives, it certainly does not provide a direct or telling link between the defendant and present prostitution operations.

fulness of that conviction was established or uncontested. (6 Cal.3d at pp. 451-452.) Recognizing that "[b]oth prosecutorial officials and courts [had] relied upon" these past Court of Appeal decisions, and noting that "[t]he risk of prejudice [arising from the admission of prior felony evidence] is not of constitutional dimensions," the *Beagle* court went on to specifically hold that the new evidentiary rule enunciated therein would "be applied only to trials begun after the date of this decision [i.e., after January 5, 1972]." (6 Cal.3d at p. 455, fn. 2.)

■ Defendant's trial was conducted over a year before the *Beagle* decision was rendered. Under pre-*Beagle* standards, the trial court's admission of defendant's prior felonies was proper, and since the *Beagle* rule has only prospective effect, defendant's present contention cannot be sustained. (See, e.g., *People* v. *Moses* (1972) 24 Cal.App.3d 384, 392 [100 Cal.Rptr. 907].)

3. *The present record is inadequate to evaluate defendant's claim that he was denied the effective assistance of counsel at the pretrial plea bargaining stage of the proceeding.*

Defendant contends that he was deprived of his constitutional right to the effective assistance of counsel at a critical stage of these criminal proceedings. During the early stages of this action a single attorney, George Carter, was the retained counsel of defendant, his wife Kathryn, and Bruce Wisner, all three of whom were originally charged with the crimes of which defendant was ultimately convicted. Although by the date of the trial defendant had obtained separate counsel, defendant claims that he was denied effective assistance of counsel at what he terms the "critical" pretrial plea bargaining stage of the proceedings. Defendant asserts that at the plea negotiation sessions his counsel in effect "sold him out" in order to obtain better treatment for the counsel's two other clients, defendant's alleged co-perpetrators in the killings. Testimony at trial did reveal that Kathryn was granted immunity from prosecution and that the death penalty was not sought against Wisner as a result of a bargain negotiated by Carter; in return for these concessions, Kathryn and Wisner gave the prosecution statements which completely incriminated the defendant. Kathryn and Wisner, moreover, were the key prosecution witnesses in the guilt trial.[11]

---

[11]At trial defendant objected to the introduction of the entire testimony of both Kathryn and Wisner on the grounds that both had previously been represented by the same counsel as defendant and thus that their testimony would, in effect, be the "fruits" of a denial of defendant's right to the effective assistance of counsel at all stages of the proceedings. The motions were both denied summarily. Defendant did not request, and the trial court did not order, an evidentiary hearing on this point.

Although this contention raises potentially serious constitutional questions, we are unable to properly evaluate its merits on the present state of the record. The record before us reveals only that Kathryn and Wisner gave their inculpatory statements to the prosecution on May 7, 1968, one week after Carter had ceased to represent defendant and Smith had been substituted as defendant's counsel of record. The present record contains no reference to the earlier course of any plea bargaining sessions, and thus it is impossible at this time to adjudicate defendant's claim that Carter failed to afford defendant effective assistance while he was still defendant's counsel. Defendant remains free, of course, to pursue this claim on habeas corpus, in which an evidentiary hearing may disclose the relevant facts that remain outside of the present record. ■ Because defendant has not yet provided such an adequate record for review, however, he has failed to demonstrate that he is entitled to any relief on this ground.

4. *Defendant's retrial did not violate his right not to be placed twice in jeopardy since the initial mistrial was granted on defendant's own motion.*

Defendant next contends that his constitutional right not to be placed twice in jeopardy was violated when he was forced to undergo a second trial after his initial trial proceedings terminated in a mistrial. ■ The motion for mistrial in the initial proceedings was sought by the defendant,[12] however, and, in general, of course, the plea of double jeopardy cannot be maintained if the defendant has consented to the prior discharge of the jury. (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 712-713 [87 Cal.Rptr. 361, 470 P.2d 345]; *Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 5 [22 Cal.Rptr. 649, 372 P.2d 641]; *Cardenas* v. *Superior Court* (1961) 56 Cal.2d 273, 275 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371]; *People* v. *Valenti* (1957) 49 Cal.2d 199, 209 [316 P.2d 633].)[13] Our past cases interpreting the double jeopardy protections demonstrate that the defendant's voluntary institution of a mistrial motion is normally a sufficient indicant of the defendant's consent to the discharge of the jury to bar later recourse to a "once in jeopardy" plea. (*People* v. *Mills* (1957) 148 Cal.App.2d 392, 394-395 [306 P.2d 1005]; *People* v.

[12]The motion for mistrial was proffered by defendant's counsel. Thereafter, pursuant to the court's questioning, the defendant expressly indicated that he personally joined in the request for a mistrial.

[13]"The right of the defendant to insist that when the trial has once commenced it shall proceed to a verdict is personal in its nature, being designed for protection against arbitrary and oppressive criminal proceedings, and therefore it may be waived." (63 A.L.R.2d 782, 785.)

*Nash* (1911) 15 Cal.App. 320, 325 [114 P. 784]; see cases collected 63 A.L.R.2d 782, 785, fn. 1.)

Defendant attempts to dilute the strength of this general principle in the instant case by contending that he cannot "realistically" be found to have consented to his retrial since his motion for a mistrial was allegedly "compelled" by the blatantly improper misconduct of the prosecutor. Defendant argues that the prosecutor's misconduct impaled him on the horns of an "impossible dilemma": if defendant did not ask for a mistrial he ran an increased risk of conviction because of the inflammatory and prejudicial material improperly presented to the jury, while if he did ask for a mistrial and it was granted the prosecution would get "a second crack" at the defendant, having gained the benefit of a full-scale rehearsal of the trial and exposure of the defendant's case.

We fail to see how defendant's "dilemma" differs in any significant respect from the normal situation arising after possibly prejudicial error has occurred at any trial. In determining whether or not to move for a mistrial, defendants must always weigh the disadvantages of allowing the prosecution to begin its case anew against the benefits of completely eliminating a given trial error; these opposing considerations were certainly as much present in all the cases establishing and applying the general rule of "consent" as they are in the instant case. (See, e.g., *People* v. *Mills* (1957) 148 Cal.App.2d 392, 394-395 [306 P.2d 1005].) Nothing in the instant record suggests that the motion for mistrial was other than knowingly and intelligently made or that the defendant and his counsel were not fully aware of the consequences of the motion.[14] Accordingly, there was no violation of the defendant's right not to be placed twice in jeopardy.

> 5. *In light of the United States Supreme Court decision in California* *v. Green (1970) 399 U.S. 149, the introduction of a witness's prior* *statement did not abridge defendant's constitutional confrontation* *right.*

Defendant next contends that the prosecutor's introduction and continued use of Kathryn's prior statements during the direct examination of Kathryn at the retrial constituted a violation of defendant's constitutional right to confront witnesses as that right had been articulated in *People* v.

---

[14]We have no occasion on the instant record to determine whether the general rule, barring a defendant's resort to the double jeopardy protections after a mistrial has been granted on his motion, is applicable in a case in which the prosecutor has deliberately caused the mistrial for the purpose of obtaining a fresh start. Although submitting this allegation, defendant points to no evidence in the record supporting such a characterization of the prosecutorial behavior and we have found no indication of such improper motivation in our review of the proceedings.

*Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] and
*People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d
422].

As noted in our summary of facts above, on May 7, 1968, prior to the
initial trial, Kathryn gave the district attorney a rather complete state-
ment concerning the events of January 31 and February 1, 1968. This
statement was extremely prejudicial to defendant, placing him at the scene
of both killings and completely contradicting his alibi defense. By the time
of the retrial, however, Kathryn was apparently much less willing to coop-
erate with the district attorney than she had been at the earlier stages of the
proceedings. In response to Kathryn's hesitancy and hostility on the witness
stand, the prosecutor, on numerous occasions during his direct examination,
challenged the witness's testimony or sought to "refresh" her memory by
reading in the presence of the jury lengthy segments of Kathryn's May 7
statement to the prosecutor.

The People maintain that these prior inconsistent statements were intro-
duced solely for impeachment purposes, and, indeed, the trial court in-
structed the jury that such prior statements did not constitute substantive
evidence but should only be considered for the purpose of testing the
credibility of the witness. The defendant claims, however, that the frequency
of the prosecutor's invocation of this "impeaching" tactic on his own
witness, and the undue length and breadth of the "impeaching" passages
in relation to the testimony being impeached, belie the prosecution's as-
sertions that the prior statements were introduced solely for the limited
purpose of impeachment (cf. *Douglas* v. *Alabama* (1965) 380 U.S. 415,
418-420 [13 L.Ed.2d 934, 937-938, 65 S.Ct. 1074]; *People* v. *Newson*
(1951) 37 Cal.2d 34, 41-44 [230 P.2d 618]) and render illusory any
protection bestowed by the court's limiting instructions.

Subsequent to the filing of briefs in this appeal, however, the
United States Supreme Court in *California* v. *Green* (1970) 399 U.S.
149 [26 L.Ed.2d 489, 90 S.Ct. 1930], disapproved the interpretation of
the confrontation clause adopted by our decisions of *Johnson* and *Green*
and held that "the Confrontation Clause does not require excluding from
evidence the prior statements of a witness who concedes making the state-
ments, and who may be asked to defend or otherwise explain the incon-
sistency between his prior and his present version of the events in ques-
tion, thus opening himself to full cross-examination at trial as to both
stories." (399 U.S. at p. 164 [26 L.Ed.2d at p. 501].) In the instant case
Kathryn did testify at trial that she had made the May 7 statement, and
thus, in light of the controlling United States Supreme Court decision in

*Green,* defendant's. constitutional contention in this regard is without merit.[15]

6. *Defendant cannot now claim that a witness's invocation of a Fifth Amendment privilege resulted in a deprivation of defendant's right to confrontation in view of his failure to move to strike the witness's direct testimony at trial.*

Defendant also raises a distinct, but somewhat parallel, contention of deprivation of his Sixth Amendment confrontation rights arising from Kathryn's invocation of her Fifth Amendment privilege against self-incrimination at several points during her cross-examination. Although Kathryn had been given immunity against prosecution on the kidnaping and murder charges, she had no immunity against prosecution for perjury in connection with possibly false statements previously given under oath in the initial trial proceedings. ■ Thus, on advice of her own counsel, Kathryn claimed her Fifth Amendment privilege when on cross-examination she was asked to repudiate specific portions of her prior testimony relating to defendant's participation in the crime. Although it appears that Kathryn's refusal to answer questions on this subject did limit the effectiveness of the defendant's cross-examination, and would have justified the court's striking at least a significant portion of her direct testimony on defendant's motion (*People* v. *Barthel* (1965) 231 Cal.App.2d 827, 834 [42 Cal. Rptr. 290]; *People* v. *Robinson* (1961) 196 Cal.App.2d 384, 390-391 [16 Cal.Rptr. 484]; *People* v. *McGowan* (1926) 80 Cal.App. 293, 296-299 [251 P. 643]; *People* v. *Boardman* (1922) 56 Cal.App. 587, 589-590 [205 P. 877]), defendant's counsel made no such motion to strike at trial and thus cannot raise the objection for the first time on appeal. (*Pilcher* v. *State* (1956) 93 Ga.App. 605 [92 S.E.2d 318, 320].)

7. *The evidence adduced at trial sufficiently corroborated the accomplice testimony.*

The key prosecution witnesses at trial were Kathryn Hathcock and Bruce Wisner, both of whom were arguably accomplices to the criminal acts of which defendant was charged. Defendant claims that the testimony of

---

[15]Moreover, defendant raised no objection to the prosecutor's continued resort to this "impeaching technique" at trial, and did not attempt to have the court limit the reading of allegedly overbroad passages. Unlike *People* v. *Odom* (1969) 71 Cal.2d 709, 717 [78 Cal.Rptr. 873, 456 P.2d 145], the instant trial commenced in October 1968, over four months subsequent to the filing of the *Johnson* opinion, and the exchanges between both counsel and the trial court clearly demonstrate that all parties were aware of that decision's significance for the instant prosecution. Under these circumstances, defendant cannot raise his contentions for the first time on appeal.

these two witnesses is insufficiently corroborated by other evidence at trial to satisfy the corroboration requirement of Penal Code section 1111.[16] Assuming, for the purpose of this determination, that both Bruce and Kathryn were accomplices whose testimony required independent corroboration,[17] we are fully satisfied that there was sufficient testimony at trial to meet the requisites of section 1111.

In *People* v. *Holford* (1965) 63 Cal.2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423], we reviewed the standard by which the sufficiency of corroborating evidence is to be determined. "The evidence required for corroboration of an accomplice 'need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556]; see Witkin, Cal. Evidence (1958) 544-545 and cases cited therein.) Moreover, evidence of corroboration is sufficient if it connects defendant with the crime, although such evidence 'is slight and entitled, when standing by itself, to but little consideration.' (*People* v. *McLean* (1890) 84 Cal. 480, 482 [24 P. 32]; *People* v. *Kempley* (1928) 205 Cal. 441, 456 [271 P. 478].)" (See also *People* v. *Perry* (1972) 7 Cal.3d 756, 769 [103 Cal. Rptr. 161, 499 P.2d 129].)

---

[16]Section 1111 provides in full: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

[17]Although he did not request such an instruction at trial, defendant now claims that the trial court committed reversible error by not instructing the jury *sua sponte* that Kathryn was an accomplice as a matter of law. If Kathryn was not an accomplice, her testimony would clearly be sufficient to corroborate Wisner's statements at trial; indeed, her testimony alone would probably be sufficient to support the conviction. Although Kathryn's extensive participation in the events subsequent to the killings might well render her an "accomplice" for purposes of section 1111 (cf. *People* v. *Wallin* (1948) 32 Cal.2d 803, 806-809 [197 P.2d 734]), we need not decide whether the trial court erred in not so instructing the jury on its own motion (cf. *People* v. *Hill* (1967) 66 Cal.2d 536, 556 [58 Cal.Rptr. 340, 426 P.2d 908]), for any error in this regard would be harmless in light of our conclusion below that there is sufficient corroborating evidence independent of both Wisner's *and Kathryn's* testimony.

■ In the instant case, the record discloses several evidentiary matters which, independent of the accomplice testimony, connect defendant with the commission of the offense. The most substantial corroborating evidence is the testimony of Joe Hamilton concerning the events which took place in the Wisner home during the evening of January 31, 1968. Hamilton's testimony revealed (1) that defendant was in the presence of the two victims at a time shortly before their deaths, (2) that defendant was in possession of the gun later shown to have been the murder weapon and (3) that defendant viciously assaulted Al Owens, one of the murder victims, shortly before Owens was shot to death. Although evidence of defendant's mere presence at the party with the two victims on the night of the murders would not, in itself, constitute sufficient corroboration (see *People* v. *Robinson* (1964) 61 Cal.2d 373, 398-400 [38 Cal.Rptr. 890, 392 P.2d 970]; *People* v. *Lloyd* (1967) 253 Cal.App.2d 236, 241 [61 Cal.Rptr. 138]), in the instant case defendant was not only placed with Owens and Barbara Simon but shown to have brutally attacked Owens, inflicting serious injuries. The coroner's report concerning Owens's head wound verified Hamilton's description of the assault.

In addition, the testimony of Paul Wolfe, Kathryn's brother, also serves to support the accomplice testimony of defendant's complicity in the crime. Wolfe testified that on February 3d or 4th Kathryn and defendant asked him to burn the tires of their car and to replace them with new tires; defendant gave Wolfe the money for the new tires. Defendant's participation in this rather unusual and, under the circumstances, suspicious request is at least slight corroboration of his involvement in the preceding activities.

Finally, while in prison awaiting trial on the present charges, defendant attempted to pass out a note to his wife; the note set out a factual background to support defendant's alibi defense and was evidently an attempt to secure his wife's testimonial support for a narrative defendant intended to relate in court. Although, once again, this evidence in itself would not support the criminal conviction, taken in the totality of the circumstances the note does tend to reinforce the accomplice testimony as to defendant's participation in the crime. (Cf. *People* v. *Luker* (1965) 63 Cal.2d 464, 471 [47 Cal.Rptr. 209, 407 P.2d 9].)

In sum, the evidence adduced at trial, independent of the testimony of Wisner and Kathryn, sufficiently corroborated the accomplice testimony as required by Penal Code section 1111.

8. *Defendant's constitutional right to a fair trial was not violated by the court's denial of his change of venue motions.*

On three separate occasions subsequent to the declaration of the initial

mistrial, defendant moved for a change of venue, contending that the number, nature, and content of the newspaper articles disseminated in Fresno County concerning both the crime itself and the criminal proceedings against defendant had created a reasonable likelihood that defendant would not be able to obtain a fair trial in the county. The trial court denied these change of venue motions on August 13, September 6, and December 2, 1968; following the September 6 ruling, defendant sought a writ of prohibition in the Court of Appeal, Fifth Appellate District, which that court denied on October 7, 1968. Defendant now claims that the lower courts committed reversible error in denying the motions for change of venue sought prior to the second guilt trial.[18] We do not agree.

Initially, upon an independent review of the relevant articles and other circumstances presented by the defendant in support of his motion (*People* v. *O'Brien* (1969) 71 Cal.2d 394, 400 [78 Cal.Rptr. 202, 79 Cal. Rptr. 313, 456 P.2d 969]), we do not find that the media coverage was either unusually widespread, inflammatory, sensational or improperly emotional, or that the journalistic narratives involved allegations of guilt or widespread revelations of evidence that were not properly admitted during the trial. The newspaper articles submitted by defendant, all from a single source—the Fresno Bee, are almost entirely factual in nature.

It is true, however, that several of the submitted articles do recount the prosecutor's accusation of defendant's participation in a statewide prostitution ring—the accusation that resulted in the initial mistrial— and defendant urges that the community's improper exposure to this accusation should have entitled him to a change of venue. Although the possibility of prejudice from the disclosure of this information cannot be entirely discounted, the transcript of the *voir dire* of the jury panel in the instant case negatives defendant's claim of bias from such reporting. While most of the jurors acknowledged that they had heard "something" about the crime through the media, all such jurors indicated that their contact had been limited to the early reporting of the crime, i.e., the original discovery of the killings rather than to the journalistic account of any

---

[18]Defendant apparently does not attack the court's ruling of December 2, 1968, denying his request for a change of venue in the penalty phase after the initial jury had been discharged. To his first two motions for change of venue defendant appended a sampling of newspaper articles appearing in Fresno County papers from July 22 to August 7, 1968, in support of his claim of inflammatory publicity. He did not attach any such exhibits to his last change of venue motion and thus from the record we would not, in any event, be able to ascertain what additional prejudicial publicity was created during and immediately subsequent to his retrial.

criminal proceedings.[19] None of the jurors stated that they had followed the trial in the papers, and indeed most of the jurors could recall nothing beyond the fact that such a crime had taken place. "The fact that numerous . . . jurors . . . did not have strong recollections of the news media's coverage of the case . . . demonstrates the unlikelihood of there having been undue publicity or inflammatory reporting of the case by the press." *(People* v. *Tahl* (1967) 65 Cal.2d 719, 731 [56 Cal.Rptr. 318, 423 P.2d 246]; see *People* v. *Jacobson* (1965) 63 Cal.2d 319, 325 [46 Cal.Rptr. 515, 405 P.2d 555]; cf. *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 354, fn. 9 [16 L.Ed.2d 600, 615, 86 S.Ct. 1507].)

Moreover, several other factors identified in our recent cases as creating particular risks of prejudice are completely absent from the instant case. For example, unlike the "popular local teenage" victims in *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 385 [66 Cal.Rptr. 724, 438 P.2d 372], or *Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 49 [84 Cal.Rptr. 135, 465 P.2d 23], the victims in the instant case were neither apparently well-known nor especially well-liked; they apparently traveled in the same social milieu as the defendant. Furthermore, the scene of the crimes, Fresno County, is considerably more populous and perhaps less provincial than the scenes of the murders in either *Maine* (Mendocino County), or *People* v. *Tidwell* (1970) 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748] (Lassen County); none of the jurors or potential jurors had any personal knowledge of the victims (cf. *People* v. *Tidwell* (1970) 3 Cal.3d 62, 73 [89 Cal.Rptr. 44, 473 P.2d 748]). Finally, unlike the defendants in *Maine, Fain,* and *Tidwell,* the present defendant was no stranger or newcomer to the community and thus no additional xenophobic prejudice was engendered.

Under these circumstances we believe the trial court did not err in concluding that there was no reasonable likelihood that defendant could not get a fair trial in Fresno County, and thus the denial of the change of venue motion was proper.

9. *Additional contentions of error.*

Defendant raises two additional claims of error which are of no merit and which may be disposed of with little discussion.

a. *Admission of illegally seized evidence:* ▮▮ Defendant challenges the admission of certain prosecution evidence, contending that the evidence

---

[19]The newspaper articles submitted by defendant in connection with his change of venue claim spanned only the time period of July 22, 1968 (report of codefendant Wisner's plea of guilty) to August 7, 1968 (report of grant of mistrial). There are no articles concerning the initial discovery of the crime and initial investigation and thus there is no basis on which this court can evaluate possible prejudice arising from earlier articles.

was obtained under the authority of defective search warrants. Defendant raised no objection to the admission of this evidence at trial, however, and thus under settled principles he is precluded from raising the instant contention for the first time on appeal. (*Robison* v. *Superior Court* (1957) 49 Cal.2d 186, 187 [316 P.2d 1]; *People* v. *Rojas* (1961) 55 Cal.2d 252, 260 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252].)

b. *Admission of color photograph of victims:* ▆▆ Defendant attacks the admission of three color photographs of the deceased as unduly inflammatory. In addressing a similar claim in *People* v. *Goodridge* (1969), 70 Cal.2d 824, 836 [76 Cal.Rptr. 421, 452 P.2d 637], we declared: "The test for admissibility is whether, in the discretion of the trial court, the probative value of the exhibits outweighs their inflammatory effect. [Citations.]" The color photographs in the instant case aided the jury in reconstructing the physical surroundings of the crime as well as the manner in which the victim's wounds were inflicted. Defendant makes no specific showing that the pictures were so duplicative or so inflammatory that the court's admission constituted an abuse of its discretion. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 326 [49 Cal.Rptr. 815, 411 P.2d 911].)

10. *Under the authority of People* v. *Anderson (1972) 6 Cal.3d 628 and Furman* v. *Georgia (1972) 408 U.S. 238, the death penalty imposed upon defendant under Penal Code section 190 is unconstitutional.*

Defendant's final contention, challenging the death penalty imposed upon him pursuant to Penal Code section 190 as "cruel and unusual" punishment violative of the state and federal Constitutions, has, of course, already been accepted by both this court (*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]) and by the United States Supreme Court (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]). ▆▆ As we explained recently in *People* v. *Murphy* (1972) *ante,* pages 349, 352, footnote 2 [105 Cal.Rptr. 138, 503 P.2d 594], "Although the electors at the November 7, 1972, General Election adopted Proposition 17 which added section 27 to article I of the [California] Constitution purporting to nullify *Anderson's* holding of the invalidity of the death penalty, the constitutional prohibitions against ex post facto laws (U.S. Const., art. I, § 10; *Kring* v. *Missouri* (1882) 107 U.S. 221 [27 L.Ed. 506, 2 S.Ct. 443]; Cal. Const., art. I, § 16) preclude the application of the amendment to cases arising before its effective date (see Const., art. IV, § 1). Moreover, imposition of the death penalty in the circumstances of the instant case would infringe federal constitutional prohibitions. (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].)"

Accordingly, the judgment appealed from must be modified to provide for a sentence of life imprisonment rather than death.[20]

The judgment is modified to provide a punishment of life imprisonment and as so modified is affirmed.

Wright, C. J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I concur in the opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment. (See Cal. Const., art. I, § 27.)

---

[20]In view of this conclusion, we need not address defendant's contention that he was prejudiced by the convening of a new jury at the penalty stage.