[Crim. No. 5051. Fifth Dist. Nov. 4, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANKIE RICE, Defendant and Appellant.

COUNSEL

William Enes, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Nancy Sweet and Roger S. Prager, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

THE COURT.*—Appellant was convicted after jury trial of felony hit-and-run driving (Veh. Code, § 20001). He appeals from the order granting probation.

---

*Before Hanson (P. D.), Acting P. J., Andreen, J., and Woolpert (W. R.), J.†

†Assigned by the Chairperson of the Judicial Council.

## Confrontation

■ Appellant first contends that the trial court violated his constitutional right to confront and cross-examine a prosecution witness. He appears to assert that the error was per se reversible.

Manette Rollins testified that on July 22, 1979, at about 9:30 p.m., she was driving home with Peggy Watts when her car's tire went flat. They pulled to the side of the road, Avenue 96, Pixley. Ms. Rollins went to the left rear bumper, where she held a flashlight while Ms. Watts jacked up the car. The emergency lights were flashing. A week later, she awakened in the hospital, with serious injuries and in critical condition. She did not see the vehicle that hit her and had no idea who its occupants were, and no one contacted her about their involvement in the accident.

Ruth Doyle testified that on the morning of July 22, 1979, from the window of her house on Avenue 128, Tipton, she saw codefendant Marion Rice, who had pulled off at the edge of her driveway in a car hitched to a trailer which was not damaged. On July 23, 1979, at about 5:30 a.m., as she was going across the highway to chop cotton, she saw the car and trailer coming toward her house. She couldn't see who was inside the car. At about 8 a.m., she returned from her work to find the car and trailer parked in her driveway. Appellant was behind the wheel and Marion was in the passenger seat.

Marion asked if they could park the trailer there. She said no, that it wasn't her property. Appellant started cussing. Marion asked her to let him leave it for three hours. She agreed, but told him to come back in three hours. Appellant drove off. Later, she noticed the trailer was damaged. Marion and appellant never returned for the trailer and it remained there until the California Highway Patrol arrived.

Charles Drake testified that he operated a market at Avenue 96 and Road 192, Tulare County. For about two months before July 22, 1979, codefendant Marion Rice lived in a trailer which he parked behind the store. Marion and appellant came into the house on Saturday, July 21, 1979, at about 11 a.m. Appellant bought a can of beer and they left. They returned at about 2 p.m. Both times, appellant was driving a dark green Valiant. Drake never saw Marion drive that car. On Monday, Drake noticed that the trailer was not there.

With the testimony in this posture, the trial court met in chambers with the prosecutor, both defendants, and their respective counsel. The prosecutor said that he wished to call Wanda Rice, Marion's wife, to testify not against her husband but only as to appellant about certain events on the evening of July 22. Marion's counsel said that he thought that Wanda would testify that she did not see appellant that night. The prosecutor explained that if she so testified, he intended to lay a foundation for impeachment with her prior inconsistent statement to Officer Dempsie.

This four-way exchange occurred:

"THE COURT: I am assuming without knowing that both she and her husband are asserting the marital communication privilege.

"MR. HAHESY [Counsel for Marion Rice]: I will go along with that.

"THE COURT: That would be the privilege not to testify against her spouse.

"MR. LEE [Deputy District Attorney]: Right.

"THE COURT: From that standpoint you can go ahead and put anything you want to with respect to testimony about Frankie. I will rule—if Ms. Voss wishes to cross examine her about something else I will—and they wish to assert the privilege they can do so and I won't allow them to continue.

"MS. VOSS [Counsel for Appellant]: Your Honor, I think this is a dangerous position because I believe the testimony is going to show first of all that Marion Rice came into the house. He never stopped drinking.

"THE COURT: If that is what she testifies to that is the end of it. There is no problem then. If that is what she is going to say that is as far as she can go.

"MS. VOSS: But—

"THE COURT: Then if he wants to impeach her with what she said about Frankie on some occasion he can sure do that.

" . . . . . . . . . . . . . . . .

"MR. LEE: I understand the proper way of foundation is that I will ask her if she had a conversation with Officer Dempsie and if she said these things. I will have to do this to get the prior inconsistent statement in.

"THE COURT: That is fine as long as it is relative to Frankie.

"MR. LEE: That's right.

"MS. VOSS: Your Honor, I think this will violate my right to confront the witnesses against him. I would have to go into her seeing Marion also on that date.

"MR. HAHESY: There is nothing in the police report to indicate that she has anything to testify to other than the conversation she had with Marion. Frankie stayed in the house—in the car. Marion went in the house. There were certain conversations that took place."

Wanda testified out of the jury's presence that about 9:30 p.m., July 22, she looked out her window and saw a black car pulling a trailer pull up. She did not see who was in the car, nor could she even see a figure. She did not see appellant that evening. Later, she talked to an officer. She did not recall his name or exactly what she told him. She did not recall telling him that she saw appellant the night of July 22.

After Wanda testified, this colloquy followed:

"THE COURT: I will permit the testimony except you have heard now what her testimony is so be careful about the manner in which you elicit it.

"MR. HAHESY: These are facts incriminating Mr. Marion Rice.

"MS. VOSS: Yes. I have the right to confront the witnesses against them.

"MR. LEE: She has never testified to Marion.

"MS. VOSS: Yes, but I have a right to ask her about Marion being there.

"MR. LEE: That is incorrect.

"MS. VOSS: It isn't. The inference was Frankie Rice was driving the car.

"THE COURT: If you wish to ask those questions, let them assert the privilege.

"MR. HAHESY: You run into a problem then.

"THE COURT: The thing is you cannot have everything in this case. You can just have most of what the law says is fine. Now, I am not going to frustrate the end of justice simply to give lip service to a rule.

"Now, as I say, she is not—she isn't testifying against herself and she is not testifying against any—with respect to any marital communication so anything she says is fine. If you want to ask her if somebody was there, that is fine.

"MR. HAHESY: I think she is testifying against herself because of the fact she is putting Mr. Rice in association with that car and the house trailer.

"MR. LEE: Which Mr. Rice?

"MR. HAHESY: Marion Rice at or about the time of the time of the [sic] accident.

"THE COURT: How is she doing that?

"MR. HAHESY: He got out of the car and came into the house.

"MR. LEE: She didn't testify to that.

"MR. HAHESY: It will put the car and Mr. Rice at the scene.

"THE COURT: That won't come out unless—it is not going to come out unless you ask it.

"MS. VOSS: Your Honor, I will have to ask it. If she asserts the privilege it would certainly be an improper inference which would be that Frankie Rice was just in the car."

Wanda then testified in the jury's presence. On direct examination she said that at about 9:30 p.m., July 22, she was in her house on Road 192 when she saw a black car and a trailer pull up. She had seen the trailer before but did not know the color. She did not see appellant at the car. She did not see the car and trailer again that evening. A few days later, she spoke to an officer. She did not recall whether she told him she had seen appellant pull in front of her house at 9:30 or that she saw the car and trailer pass by her house an hour later. She did not think that she had described the car as a dark blue 1965 Plymouth with Washington plates or the trailer as green.

What follows is the entire cross-examination of Wanda by appellant's trial counsel:

"Q. Who did the trailer belong to? Do you know?

"MR. LEE: I am going to object to that, your Honor.

"THE COURT: Your objection will be sustained.

"BY MS. VOSS: Q. When you spoke to Officer Dempsie, did you tell him you assumed it was Frankie driving?

"A. I don't remember whether I did.

"Q. Did you see somebody get out of the car?

"MR. HAHESY: Your Honor, if the court please—

"THE COURT: The objection will be sustained.

"BY MS. VOSS: Q. Did you know who was in the car at all?

"MR. HAHESY: Your Honor, that is the same question.

"THE COURT: Did you see Frankie in the car?

"THE WITNESS: No.

"THE COURT: All of the questions will be deemed to be objected to and the objections will be sustained.

"Ms. Voss: I have no more questions then."

California Highway Patrolman Robert Dempsie testified to his on-the-scene and subsequent investigation of the accident. At Mrs. Doyle's residence, he found the trailer which had been involved, the same trailer which Mrs. Doyle had seen on the 22d and 23d. Out of the jury's presence, the prosecutor offered to prove that Dempsie would testify that Wanda told him that she saw appellant pull up in front of her house at 9:30 p.m., July 22, driving a dark blue 1965 Plymouth with Washington plates pulling a green trailer, and that she saw the car and trailer pass the house again an hour later.

Appellant's trial counsel raised the "same objection that I had to [Wanda] testifying." The trial court "noted" the objection. Dempsie then testified as per the offer of proof. Dempsie also testified to statements made to him by Marion and appellant. With regard to Marion: "A. [Officer Dempsie] He related to me on July 22nd that he had gone to Charley Drake's store to pick up the trailer with his brother. He then went to Porterville and he stated he was not driving when they went to Porterville. He stated he was drinking very heavily throughout the day and in the early evening he passed out. He later awoke at about ten p.m. in the evening, and at this time the car was—the car and trailer were at Charley Drake's store. It was parked at Charley Drake's store. The car was sitting up against a power pole. He looked at the power pole and told me he couldn't understand how the powerpole [sic] had done all that damages to the trailer. And he remembered going to the Doyles the following morning and leaving the trailer there. Other than that he said he couldn't remember anything."

As to appellant: "Q. [By Mr. Lee]: Would you tell the court what he said in regards to the events of July 22nd?

"A. [Officer Dempsie]: He told me he and his brother went to Charley Drake's store at about eight or 8:30 on July 22nd, and it was there that they picked up the trailer and he, Frankie, was driving at the time. They then drove to Woodville and picked up Frankie's girl friend. They then went swimming in the river and while they were swimming he, Frankie, hit his head on the bottom and had to be taken to Sierra View Hospital for treatment.

"At that point he told me that his girl friend walked home from the hospital so she would have left him at that time. After leaving the hos-

pital he, Frankie, drove to his sister's house to leave the trailer. This was in Porterville, but she wasn't home. Again with he, Frankie, driving they drove over to Charley Drake's store. He parked the vehicle, got out of the car, and got inside the trailer and went to sleep. He awoke about daybreak. He got out of the trailer and saw it was all torn up. His brother, Marion, was also awake at that time. Then I questioned him.

"Q. Excuse me, your voice is dropping.

"A. I questioned him at that time, and I asked him do you meanwith [*sic*] you sleeping in the trailer all that damage occurred and you didn't wake up, and his response was I guess not. I then asked him at any time during the 22nd did you see anyone other than yourself drive the vehicle, and his answer was no. Then I posed the question did you see the power pole that was supposed to have been struck, and his answer again was no."

Before questioning appellant, Dempsie had established that appellant owned a dark blue 1965 Dodge with Washington plates which had been involved in the accident. Cross-examination by appellant's trial counsel elicited that Wanda had said she was pretty sure, but not positive, that appellant was driving.

Marion and appellant testified in a manner similar to Dempsie's version of their pretrial statements.

The record clearly shows that the trial court erroneously restricted appellant's cross-examination of Wanda. Respondent argues that in fact the husband/wife privilege was never invoked and that appellant's trial counsel never asked any questions about codefendant Marion, Wanda's husband.

Respondent misses the point. Whether or not the privilege was invoked is irrelevant. The trial court cut off appellant's cross-examination of Wanda, and respondent has offered absolutely no justification for this ruling. What no one realized below and neither party notes here is that when Wanda testified for the prosecution, she *waived* both the privilege not to be called as a witness (Evid. Code, § 970) and the privilege not to testify against her spouse (Evid. Code, § 971). (Evid. Code, § 973, subd. (a).) The trial court clearly erred in sustaining objections to questions well within the scope of permissible cross-examination.

We need not hold that every exclusion of evidence rises to constitutional dimensions. Here, the trial court cut off an entire major line of examination which clearly was intended to create a basis for inferring that Marion, not appellant, was the driver of the car and trailer when the accident occurred. While Marion was not mentioned by name in the questions to which the trial court sustained objections, the *in camera* representations of counsel and the rest of the record make unmistakably clear that Marion was the subject of the inquiry which the trial court foreclosed. The questions could have had no other purpose, and Marion's counsel was the primary objector. The trial court did curtail appellant's Sixth Amendment right to cross-examine Wanda.

Moreover, the trial court compounded its error when it permitted Dempsie to testify to a prior inconsistent statement made by a witness who had not been subject to full cross-examination at the trial. (See *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]; *People* v. *Hathcock* (1973) 8 Cal.3d 599, 616 [105 Cal.Rptr. 540, 504 P.2d 476]; *People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 705 [89 Cal.Rptr. 330].)

Because the trial court committed federal constitutional error in cutting off cross-examination of Wanda and in permitting the prior inconsistent statement testimony by Dempsie, the question becomes one whether the error was harmless beyond a reasonable doubt. We cannot say that it was. Respondent argues that appellant stated that he was the only person who drove the car on the day of the accident. But appellant did not testify that he drove the car when the accident occurred, and the thrust of his defense was that he was asleep in the trailer and someone else must have been driving.

Respondent also suggests that even if he was not driving appellant would have been criminally liable as the vehicle's owner riding in it at the time of the accident. Again, the record does not compel a finding that appellant was *in the car* at the time of the accident. There is no direct evidence that he was. With the Dempsie testimony excluded, the trial court might well have concluded that appellant was asleep in the trailer. Dempsie's testimony was critical for the prosecution because it placed appellant behind the wheel a short time after the accident, thus creating a basis for an inference that appellant was driving when the incident occurred.

As to the evidence which the trial court improperly excluded, we cannot begin to speculate. However, the record suggests that the defense might have been able to elicit testimony which would have supported an inference Marion was the driver. In any event, without knowing what the defense would have turned up, we cannot hold that the error was harmless beyond a reasonable doubt. For that matter, we could not hold that the error was harmless under the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Appellant's first contention has merit.

Appellant's second contention, which pertains to Dempsie's seizure of the trailer which he found on the Doyle property, does not. The trailer was in plain view from a constitutional vantage point and was subject to seizure and examination as an instrumentality of the crime. (*People v. Minjares* (1979) 24 Cal.3d 410, 421-422 [153 Cal.Rptr. 224, 591 P.2d 514]; *Guidi v. Superior Court* (1973) 10 Cal.3d 1, 18-19 [109 Cal.Rptr. 684, 513 P.2d 908]; *North v. Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155].)

The judgment (order granting probation) is reversed.