Filed 8/24/16  P. v. Jackson CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B259877 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA127281) |
| v. | |
| DUPREE JACKSON and EWAYNE BERRY, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 29, 2016, be modified as follows:

The final paragraph on page 29 is deleted.

This modification requires no change in the judgment.

The petition for rehearing is denied.

ROTHSCHILD, P. J.    CHANEY, J.    LUI, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DUPREE JACKSON and<br>EWAYNE BERRY,<br><br>        Defendants and Appellants. | B259877<br><br>(Los Angeles County<br>Super. Ct. No. TA127281) |

        APPEALS from judgments of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Reversed.

        Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Jackson.

        Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Berry.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Yun K. Lee, Deputy Attorney General, for Plaintiff and Respondent.

_____

Dupree Jackson and Ewayne Berry appeal from the judgments entered following a jury trial in which they were convicted of second degree murder and conspiracy to commit murder. Each defendant raises numerous claims of error and joins in his codefendant's claims, to the extent applicable. Of pertinence to our disposition, Berry contends the trial court erroneously admitted (against him) an incriminating message Jackson sent him through Facebook and erroneously instructed the jury that defendants' testimony required corroboration and that defendants were accomplices as a matter of law. We agree the trial court so erred and conclude the errors are prejudicial. Accordingly, we reverse.

## BACKGROUND

On December 21, 2012,[1] Ediberto Genis was fatally shot in the head outside 815 East 113th Street (Stoners house) in Los Angeles. Four juveniles were ultimately arrested and charged with Genis's murder and conspiracy to murder: Jackson (aged 17), Berry (aged 16), Jason Byers (aged 14), and Shannon Hilt (aged 17). Hilt accepted a prosecution plea offer of eight years in prison. Byers agreed to testify for the prosecution and accepted an offer of 13 years in prison. Byers was the sole percipient witness to the crimes who testified.

Byers testified that he lived in Nickerson Gardens. He had known Jackson all of his life and they were friends. Byers met Hilt at Locke High School (Locke) and had a close relationship with both Hilt and Hilt's sister. Byers knew that both Jackson and Hilt lived in the vicinity of 113th Street and Belhaven Street. Byers only knew Berry from seeing him at Locke. They did not attend the school at the same time, but Byers had visited the Locke campus on occasion while he was in middle school and he had seen Berry on the Locke campus at that time. He did not know that Berry lived in downtown Los Angeles.

---

[1] Undesignated date references pertain to 2012.

**Background to the shooting**

The Bounty Hunter Bloods gang operates in and around Nickerson Gardens and has a clique around 113th Street and Belhaven Street known as the Belhaven Bounty Hunter Bloods (Belhaven gang). A Latino gang called the Mid City Stoners (Stoners) encroached on the territory claimed by the Belhaven gang and a number of its members resided at the Stoners house. The Stoners and Belhaven gangs were rivals; their members crossed out each other's graffiti and shot each other. Dejuan Becker, also known as Thugga, survived such a shooting, in which Genis was implicated.

The residents of the Stoners house also harassed young African-Americans who walked past their home. Byers testified this was a daily occurrence. The Stoners shouted racial epithets, shouted insults about the Bounty Hunters, displayed weapons, and threatened to turn their pit bulls loose on the young people. The Stoners had done this on December 20.

On December 21, a group of about 15 African-American students, including Byers (but not Hilt, Berry, or Jackson[2]), walked past the Stoners house on their way home from Locke. Byers denied he was a gang member, but other people in the group were members of the Belhaven gang. The Stoners verbally harassed the students and some of the students responded in kind. One of the Stoners lifted a gun that was tucked in his waistband. Most of the students went home, but some were angry and wanted to fight. Byers calmed everyone down because the Stoners were armed.

**The plan and preparation for the shooting**

Byers went to Jackson's home, but he was not there. Hilt and his sister came out and spoke with Byers. Byers testified that he and Hilt had previously discussed the Stoners's conduct, and on December 21 they said, in effect, " 'enough is enough.' "

---

[2] On cross-examination Byers initially contradicted his direct testimony and stated that Jackson was part of the group that walked past the Stoners house on December 21. He subsequently changed his testimony again and said Jackson was not part of the group.

Byers later contradicted himself and testified that the Stoners's conduct was not a big deal to him or Hilt.

Jackson walked up and joined Byers, Hilt, and Hilt's sister. Byers testified both that he told Jackson and Hilt what had happened and that he did not have to tell Jackson or Hilt about what had happened because they "already knew."

Byers provided contradictory testimony regarding Berry's arrival on the afternoon of December 21. He initially testified that Berry approached him, then left, then came back when Byers was talking to a few other people, but Byers later testified that he first saw Berry that day when Berry approached as Byers was talking with Jackson and Hilt. Byers told Berry about what had happened with the Stoners, and Berry said he did not think that was right and that he also had experienced problems with the Stoners.

On his own initiative, Byers "borrowed" a bicycle that was lying in the street by the curb. He rode down the block to see if the Stoners were still outside. Byers returned to the others and said that people were still in front of the house. Jackson went inside his house, then returned. Byers dropped the bicycle and the four boys walked a little way to Oscar Rosales's house and sat behind a car. Jackson and Hilt worked to clear a jam in a nine-millimeter semiautomatic handgun. After the jam was cleared, Hilt had the gun. Byers testified he did not see who provided the gun, but he assumed that Jackson had done so.

The Rosales family lived on 113th Street two houses east of Wadsworth. Sandy Rosales testified that about 2:30 p.m. on December 21, she looked out her window and saw four African-American teenagers walk up to her father's car. She told a detective who interviewed her later the same day that there were six, not four teenagers. Two sat behind the car and appeared to be putting something into a black semiautomatic handgun. The rest of the group crossed the street. She recognized one member of the group as someone who lived in a nearby yellow apartment.

Sandy alerted her father, Oscar Rosales. He looked out the window and saw four African-Americans behind his car. He recognized two of them from the neighborhood.

One was Jackson, who lived in a yellow-colored apartment building. Rosales testified he knew Jackson's father. The other was Hilt, with whom Rosales had a friendly relationship. Rosales had also seen Hilt's father driving a red Infiniti. Rosales testified adamantly that Hilt was not the person wearing red shorts. However, he had told a detective on the day of the shooting that the father of the boy in red shorts was the one who drove a red Infiniti, and a detective testified that Hilt's father drove a red Infiniti. Byers testified Hilt was the one who was wearing the red shorts. Rosales explained he had been confused by the questioning. Rosales did not recall seeing Berry anywhere that day.

Rosales asked the group what they were doing. One said they were just playing and another said he had injured his foot. On December 21, Rosales told the police that he could see that two of the boys were loading bullets into a black gun. At trial, he testified it looked like a gun, but he could not see it well enough to be sure.

Byers testified that Hilt was the only member of the group that spoke to Rosales, and Hilt told Rosales not to worry because they were not going to do anything to him. Rosales told the police that the boy who said he had injured his foot put the gun under his sweater and walked away while the other three remained by Rosales's car. Rosales then drove away in his car. At the corner of 113th and Wadsworth the boy in the red shorts told Rosales not to continue on 113th Street so that nothing would happen to him. Rosales asked whether they were going to kill someone, and the boy responded that they were going to shoot "a Mexican guy" who had "come the day before to shoot at them." Rosales turned off 113th Street and continued his journey.

Byers testified that the four boys discussed a plan to take the gun and shoot at anyone who was in front of the Stoners house. He did not know how Berry was picked to be the shooter and did not know Berry's motive for participating. Byers thought the objective was not to kill anyone, but to merely instill fear in the Stoners or warn them. Byers initially testified he did not remember who told him to take Berry down the block by bicycle. After being shown a transcript of his statement to the police, he testified

5

Jackson had told him to do this. On cross-examination, however, Byers testified that no one told him to do that; he just felt he should do it. Although Byers was younger than the other three boys, he testified that he was not intimidated by any of them. Byers was a lot taller and heavier than Berry. Byers got the "borrowed" bicycle and rode down the street with Berry on the back.

**The shooting**

Byers testified he stopped the bicycle at the corner of 113th Street and Wadsworth. Byers waited at the corner while Berry walked down 113th Street toward the Stoners house, which Byers estimated to be about 55 feet from the corner. Berry walked past the Stoners house on the opposite side of the street, then turned around at the corner and walked up the block in the opposite direction. When he was directly across from the Stoners house, Berry fired four or five shots while standing on the sidewalk. Berry ran back toward Byers, they got onto the bicycle, and rode back to where Jackson and Hilt were waiting, which was more than 100 yards down 113th Street toward Belhaven (east). Byers noticed that one of Berry's shoes was missing before Berry got back on the bicycle. Byers estimated that "a little over an hour" had elapsed between his confrontation with the Stoners and the shooting.

Byers testified that Berry threw away his remaining shoe in a trash bin and the group hid the gun. However, Byers could not pinpoint the location. He testified the gun was "tucked away" in a yard by a car, but he did not know which of the other three "tucked it."

**Aftermath**

Los Angeles Police Department officers responding to the scene of the shooting found Genis lying in the street with an obvious gunshot wound to the head. Officers recovered three nine-millimeter casings almost directly across the street from Genis's body. One was in a driveway and the other two were "by" a tree. Apparently police did not measure the distance between Genis and the casings, but a detective testifying at trial estimated the distance as about 75 feet. The same detective agreed it would take both

6

luck and skill to shoot someone in the head from that distance. Police also found a Nike shoe near a car parked about 16 feet east of the casings.

At some point not revealed by the appellate record, police served a search warrant on Facebook. A custodian of records for Facebook testified at trial as follows. On December 22, someone using the name "Seconnd [*sic*] toNone" sent a Facebook message to Facebook user "Gassing Ewaynee," who had the same user account number as "Ewayne Escalante." The message stated, "A Bro where my burner at?" The recipient did not delete the message. Seconnd toNone and "Young Duke" had the same user account number, e-mail address (which began "duke.jackson"), and "vanity name," meaning it all referred to the same Facebook account. The custodian of records testified that this user changed his "display name" to Seconnd toNone on December 22. The witness also testified, however, that on December 12 Seconnd toNone sent a message to someone else saying, in part, "this Dupree." The custodian further testified that at some unspecified time the user known as Ewayne Escalante deleted his Facebook account.

Prosecution gang expert Officer Francis Coughlin testified that in gang vernacular, a "burner" means a gun and "gassing" someone means to kill the person. Detective Nathan Kouri testified that before he arrested Jackson he had examined Young Duke's Facebook page and observed photographs of Jackson in which he was making a Bounty Hunters gang hand sign and/or wearing apparel associated with the Bounty Hunters gang. Thugga was in some of the photos. During a postarrest search of Jackson's bedroom police recovered a periodical on which "Bounty Hunter Bloods" and "Belhaven" had been written with a marker and a three-ring binder on which "Belhaven Bounty Hunters" and "Duke" had been written. It also had the letters "MCS" written and crossed out, signifying that the Mid City Stoners were an enemy.

Jackson, Byers, and Hilt were arrested in this case on March 5, 2013. Berry was arrested on March 8, 2013.

7

**Gang evidence pertaining to codefendants and crimes**

Coughlin testified that gang members, associates, and "wannabes" "put in work" for their gang, i.e., they commit crimes. For a serious crime such as murder, however, the participants would require a high degree of trust in one another arising from knowing one another well and committing prior crimes together.

Coughlin opined that Jackson, Hilt, and Byers were all members of the Bounty Hunters gang. With respect to Jackson, this was based in part on the photographs of him making the gang's hand sign and wearing apparel associated with the gang. Coughlin testified that members of the Bounty Hunters gang generally and Thugga in particular would not have allowed Jackson to make the gang's hand signs unless he was willing to put in work for the gang. None of Jackson's tattoos (shown in photographs introduced by the prosecutor) was gang-related. In addition, Coughlin testified Jackson had admitted membership in the Bounty Hunters gang during a May 2012 police stop and, during another stop in November 2011, had said he was from the Belhaven Bloods gang.

Coughlin once stopped Berry on the street, at which time Berry admitted membership in the Athens Park Bloods gang but said he also hung out with some Bounty Hunter Bloods. Based upon commission of the crimes in this case and "all intelligence," Coughlin opined Berry was a Bounty Hunters member, not an Athens Park member. In the prosecution's rebuttal case, Coughlin testified that this "intelligence" consisted of Berry's participating in a robbery in the Belhaven area with "Duke" during which they checked people's pockets and asked if they were Stoners. In addition, Berry had family members who were Bounty Hunters. Coughlin conceded that none of Berry's tattoos were gang-related and there were no photographs of him making gang signs.

In response to a lengthy hypothetical question, Coughlin opined that the crimes were committed for the benefit of, at the direction of, and in association with the Bounty Hunters gang. He explained, in part, that they had "to retaliate for what happened to them."

8

**Berry's statement to police**

Detectives interviewed Berry after he was arrested and, ultimately, an audio recording of his entire statement was introduced at trial. Berry volunteered the information that he had had two separate Facebook accounts, and that the name on his second account was Ewayne Escalante. The name on his prior account had been Mackwaaynee. He had deactivated the Ewayne Escalante account a few days earlier and the prior account about a year earlier. He explained he had done so at his mother's request because she did not like him using "all that internet stuff."

Berry had previously lived at 105th and Figueroa and attended Locke, but had moved downtown and changed schools. In the summer after he moved he suffered serious injuries when struck by a motorcycle near 113th and Belhaven. He broke both legs and knees and has a long metal rod in his right leg.

A number of Berry's family members were Bounty Hunters, but Berry had begun associating with Athens Park when he lived in that gang's area. After that, Bounty Hunters gave him trouble and he had to fight a few of them when he attended Locke.

Berry stated that on December 21 he went to the Locke campus with "Baby Bugsy," who was also from Athens Park. They were there "all day." After school let out, Berry, Baby Bugsy, and others were walking down 113th Street. Berry saw a group of Bounty Hunters and he also saw and heard a group of "Hispanic dudes" who were in front of a house yelling "Mid City" and making gang hand signs. Berry kept walking because "we don't beef with Mid City" and he did not want to get jumped. At some point, Berry and Baby Bugsy separated.

Jason (Byers) and Duke (Jackson) approached in the middle of the street. Jason was on a bike and Duke was walking. Duke told Berry to go down the street. Berry complied. When he looked back, the two were proceeding, but Duke was walking at a faster pace. Before Berry reached the corner, he heard gunshots and ran. He did not see who was shooting but assumed it was Duke and Jason. Berry volunteered to the police that he had lost one of his shoes as he ran, "before" he "hit the corner," then he turned the

9

corner and kept running all the way across Imperial Highway. When he stopped running, he called his aunt, who lived in the area, and she picked him up. He knew he would not be getting his lost shoe back, so he threw away its mate.

When the police pressed Berry for the location of his lost shoe, he said it was "closer to Wadsworth" than where he encountered Duke and Jason. Kouri had apparently drawn a map that was not to scale on a tiny piece of paper. Berry apparently pointed at that paper and said, "I lose my shoes [*sic*] somewhere right here." Kouri responded by saying, "I'm going to write the word shoe right here." Kouri later falsely told Berry that they found his shoe in the midst of the casings. Berry responded that that was "crazy" and denied his shoe was amid the casings. When Kouri referred to his little map and the position he had written "shoe," Berry stated that his shoe did not come off "this close to the corner" and pointed to a "little dot" which was the location where his shoe came off. At trial, Kouri testified that Berry "then moved the placement of the shoe a little bit farther west," closer to the Stoners house.

Kouri also falsely told Berry that all of the percipient witnesses had independently identified Berry as the shooter and that the police had home security camera footage of Berry shooting. Berry said that was "crazy as hell" and urged the police to look at the video because it would show everything that happened. The police also told Berry they had obtained his DNA from the shoe and asked him if that was a coincidence. Berry replied, "No, 'cause that's my shoe."

Berry told the police that prior to December 21 he had seen Jason only three times in his life, but Berry knew he was from the Bounty Hunters gang. Berry knew Duke, whom he had met while attending Locke, but he believed Duke held a grudge against him because he fought with Duke's brother and argued with Duke's sister. Berry said he had met Hilt in the eighth grade and they were friends. Berry was also friendly with Hilt's sister and Hilt's mother knew Berry.

**Berry's testimony at trial**

Berry testified at trial that he lived in downtown Los Angeles in December 2012. He had not attended Locke since April of 2012, but in that interval he twice had visited his Aunt Jodie, who lived at 109th and Central, which was near Locke and in an area claimed by the Bounty Hunters gang. When Berry attended Locke he lived near 105th Street and Figueroa and hung around with members of the Athens Park Bloods gang, which was a different gang situated around Figueroa and 120th to 127th Streets. The Athens Park Bloods did not get along with the Bounty Hunters. Berry had at some point lived in an area claimed by the Bounty Hunters gang, but he had never lived in the Belhaven area or in Nickerson Gardens and had never "kick[ed] it" with the Bounty Hunters. He had heard of the Stoners, but was not aware they were active in Locke. Berry did not claim membership in any gang.

Berry testified that he was about two years older than Byers, who did not attend Locke when Berry was there. Berry had seen Byers around and they had mutual friends, but Berry did not really know Byers. Berry knew Hilt from middle school and Locke, but claimed he was not close to Hilt. He admitted they sometimes communicated through Facebook and he referred to Hilt as "bro," but they "never kicked it." Berry knew that Hilt lived at 113th Street and Belhaven, but did not know if he was a Bounty Hunter. When the motorcycle struck and injured Berry, Hilt's mother called the police and helped Berry. Berry knew Jackson from Locke, where they were in the same Spanish class. Due to a fight Berry had with Jackson's brother, they did not trust one another and did not talk. They were, however, friends on Facebook. While Berry was in custody on this case, he found out that Byers and Hilt had a close relationship.

Berry testified that Byers's testimony implicating Berry was a lie. On the day of the shooting, Berry was on Christmas vacation from school. He went to the Locke campus sometime in the afternoon to visit with his cousin, who was a football coach there. Afterward, he was walking to his Aunt Jodie's house. He and his friend Baby Bugsy were eastbound on 113th Street, then they separated and Berry continued alone.

11

As Berry walked toward Wadsworth, Hispanics on the other side of the street were yelling "Mid Cities." Berry saw Byers (on a bicycle) and Hilt (on foot) approaching him from the area of 113th Street and Belhaven. Byers stopped and stood at the corner of 113th Street and Wadsworth, while Hilt continued walking toward Berry. As Hilt walked past Berry, Hilt said, "Go down the street. Go down the street." When Hilt was about three feet past Berry, shots were fired and Berry ran. Berry denied that he was the shooter and said he did not look to see who was shooting. Berry turned right at Wadsworth, crossed Imperial Highway, and stopped at an elementary school to call his aunt to pick him up. Because Berry had a metal rod in his leg and it tended to swell, he fastened the shoe on that foot loosely. As Berry ran, that shoe came off. He did not go back for it because he believed the Hispanics who yelled at him would still be outside. Therefore, he just threw the remaining shoe away.

When Berry was interrogated by the police, he lied and implicated Jackson because he wanted to protect Hilt, based on the help Hilt's mother rendered him. Berry testified he did not know who changed his Facebook name to Gassing Ewaynee, but he denied doing so. Until trial, he did not know who had the Facebook name Seconnd toNone and he did not know why that person sent him the message about a burner. Therefore, he did not reply to the message.

Berry testified that Kouri repeatedly told him that his shoe was right in the middle of the casings, but never showed him the photo of this he claimed to have. Berry recalled Kouri as a defense witness, and on cross-examination Kouri volunteered that Berry had acted as if Kouri had not understood him when he first described where he had lost his shoe.

**Jackson's testimony at trial**

Jackson also testified at trial. "Duke" had been his family nickname since childhood. As of December of 2012 he had lived at 1111 East 113th Street for two or three years. The Stoners house is about 25 to 30 houses away. On December 21, Jackson was in class at Locke until 2:10, then his uncle drove him home. Jackson did not see

12

anything going on when they drove past the Stoners house and did not see Byers or Berry. Jackson estimated he got home around 2:30 p.m. and he stayed in the house the rest of the day. His mother left to go Christmas shopping and directed him to baby-sit his three-year-old nephew, who was sleeping. Jackson ate, watched a movie and some music videos, then fell asleep. He awakened when his mother came home around 5:00 or 5:30 p.m. He did not hear any shots or other disturbances, but his mother said there were a lot of police in the street. The next morning she told him she had heard that someone had been shot. Jackson did not have any problems with the Stoners. He usually got a ride home from school from his uncle, and on the few occasions he walked he experienced no problems.

Jackson testified that, through family members, he associated with members of the Belhaven Bounty Hunters gang, but he did not do anything for the gang, and none of his tattoos was gang-related. He denied ever telling a police officer he was a gang member. He only made gang signs in Facebook photos to get "likes" from girls at Locke, and he was not proud of the photos. Thugga is Jackson's older half brother. He initially did not mention Thugga when the police asked him about his brothers because Thugga had told him not to let the police know they were related to prevent the police from "com[ing] down" on Jackson for things Thugga had done.

Jackson was "somewhat" close to Hilt, who was his neighbor, and he knew that Hilt was not a gang member. Byers's testimony that he had known Jackson his whole life was false. Jackson had seen Byers at school, but Byers was about three years younger than Jackson. Jackson did not really know Byers and did not know if Byers was a gang member. Jackson had a strained relationship with Berry, who previously had gotten into a fight with Jackson's brother. Jackson and Berry did not speak and held mutual grudges. Jackson denied participating in a "pocket-checking incident" with Berry and denied that the four codefendants hung out together.

Jackson admitted he had sent a Facebook message to Gassing Ewaynee asking "where my blower," by which he meant a close female friend of Berry who performed

13

oral sex on Jackson. Jackson had to use code names like "blower" because his girlfriend sometimes went through his phone. Jackson did not know how "blower" was changed to "burner," but he used other people's phones to access Facebook, and the phone he used to post that message may have had spell-check. Jackson denied he gave anyone a gun on December 21.

**Jackson's statement to police**

The prosecutor played only a few brief segments of Jackson's audio-recorded statement to the police for impeachment. Jackson told the police he got home early from school on December 21. Asked for a time, he said, "[A]ll I know is when I made it home, Maury was on. I got out of school probably around 1:30." Jackson said that after he got home, "I never left. I left to go get some weed,"[3] then immediately repeated that he never left.

When the police asked Jackson whether he remembered a shooting in late December on the street where he lived, he said he did not.

**Verdicts and sentencing**

A single jury convicted defendants of second degree murder and conspiracy to commit murder. With respect to Berry, the verdict form asked the jury to specify the degree of murder Berry conspired to commit, and the jury specified second degree murder. The verdict form for Jackson did not include a request for such a finding. The jury further found, as to each defendant, that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members. The jury further found that Berry personally and intentionally fired a gun, causing death or great bodily injury. (Pen. Code, § 12022.53, subd. (d).)[4] As to both defendants, the jury found that a

---

[3] Jackson testified he already had weed at the house and told that to Kouri to get the police off his back.

[4] Undesignated statutory references are to the Penal Code.

14

principal personally and intentionally fired a gun, causing death or great bodily injury. (§ 12022.53, subds. (d)–(e).) The court sentenced each defendant to 40 years to life in prison for murder and stayed the term on the conspiracy charges pursuant to section 654.

## DISCUSSION

### 1. Erroneous admission of Jackson's Facebook message to Berry

Before the Facebook custodian of records testified, Berry objected to admission of Jackson's message about the burner on the ground it was inadmissible hearsay.[5] The prosecutor argued, and the trial court ruled, that it fell within the exception for a coconspirator's statement. The prosecutor's theory was the conspiracy was ongoing at the time the message was sent because the conspirators had not yet been arrested. Berry contends the trial court erred by admitting the message against him.

### a. Pertinent legal principles

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 577.)

In order for a hearsay statement made by an accused's coconspirator to be admissible against the accused, there must be independent prima facie evidence of the existence of a conspiracy and independent evidence of the following three preliminary facts: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." (*People v. Leach* (1975) 15 Cal.3d 419, 431, fn. 10 (*Leach*); Evid. Code, § 1223.) None of these facts may be established by means of the statement itself, except insofar as its content reflects upon whether it was made in furtherance of the conspiracy. (*Leach*, at p. 431, fn. 10.)

---

[5] Berry also mentioned a potential confrontation clause violation, but both defendants ultimately testified, mooting any such issue.

15

Generally, a conspiracy comes to an end when " 'the substantive crime for which the coconspirators are being tried is either attained or defeated.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 143.) However, a conspiracy may continue until its "*primary goal*" has been attained. (*Id.* at pp. 143–144.) This is not an issue of law, but a question "for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended. [Citations.] Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy." (*People v. Saling* (1972) 7 Cal.3d 844, 852 (*Saling*).) There must, however, be independent evidence that the conspiracy was still operative at the time of a coconspirator's statement, notwithstanding the accomplishment of the primary objective. (*Leach*, *supra*, 15 Cal.3d at pp. 432–433 [no evidence supported conclusion that objectives of conspiracy to murder included collection of insurance proceeds].)

"Generally the conspiracy comes to an end with the performance, or failure to effect the contemplated act, and the concealment is a mere incident thereof which is not a new conspiracy so as to toll the running of the statute of limitations, or permit the post-offense declarations of one conspirator to be used against another." (*People v. Hardeman* (1966) 244 Cal.App.2d 1, 19–20 (*Hardeman*).) "In *Krulewitch v. United States* [(1949)] 336 U.S. 440, the Supreme Court rejected, as a further breach of the general rule against the admission of hearsay evidence, the government's argument that 'even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective.' " (*Saling*, *supra,* 7 Cal.3d at p. 853.) *Saling* adopted the *Krulewitch* rule. (*Leach*, *supra*, 15 Cal.3d at p. 431.)

**b.      The trial court erred by admitting the message as to Berry.**

The prosecutor, trial court, and Attorney General failed to cite any authority for the proposed new rule that a conspiracy continues until the conspirators have been arrested.

Such a rule, of course, does not exist and is contrary to established law that in general a conspiracy ends when the substantive crime is either committed or defeated.

The conspiracy here was expressly charged as one to commit murder. The Facebook message in issue was sent a day after the contemplated act of murder. Pursuant to *Saling*, *Leach*, and *Hardeman*, we do not infer there was an implicit, ongoing conspiracy to conceal evidence and escape arrest, and there is no independent evidence in the record that the conspiracy was still operative when Jackson sent the message. To the extent evidence in the record may support a finding that the conspiracy included hiding the gun, that evidence also shows that that objective was achieved on the day of the murder when, according to Byers, the coconspirators "tucked" the gun in someone's yard. Accordingly, we conclude the message was not admissible under the exception for statements of a coconspirator. Moreover, had there been independent supporting evidence in the record, the trial court was required to allow the jury to determine whether the conspiracy continued, not decide the issue as a matter of law.

The Attorney General does not even argue that the coconspirator statement exception applies. Instead, citing *People v. Jurado* (2006) 38 Cal.4th 72, she argues that the message was not hearsay "because it was a request (question) that did not assert the truth of any fact." The Attorney General attempts to extend *Jurado* far beyond its facts, so as to obliterate the category of implied hearsay. In *Jurado*, a witness testified that one of the accomplices asked him for a " 'gat.' " (*Id.* at p. 117.) The Supreme Court ruled that this statement requesting a gun was not hearsay: "The request for the gun, by itself, was not hearsay, however, because an out-of-court statement is hearsay only when it is 'offered to prove the truth of the matter stated.' (Evid. Code, § 1200.) Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*Ibid.*) Of course, Jackson's message consisted of a question, not a request.

More important, either questions or requests can constitute implied hearsay. While "[r]equests and words of direction generally do not constitute hearsay," "these statements

17

reasonably can be viewed as *implied* hearsay. '[E]vidence of an express statement of a declarant is . . . hearsay evidence if such evidence is offered to prove—not the truth of the matter that is stated in such statement expressly—but the truth of a matter that is stated in such statement by implication.' [Citation.] 'While the ultimate fact the statement is offered to prove is not the matter stated, the truth of the implied statement is a necessary part of the inferential reasoning process.' [Citation.] 'An implied statement may be inferred from an express statement whenever it is reasonable to conclude: (1) that declarant *in fact intended* to make such implied statement, or (2) that a recipient of declarant's express statement would *reasonably believe* that declarant intended by his express statement to make the implied statement.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289.) The prosecutor clearly offered Jackson's message to prove the truth of the statement implicit in his question, i.e., Berry knew where Jackson's gun was, either because he had it or had recently had it in his possession, which was in turn relevant to support the prosecution's theory that Berry shot Genis. Indeed, absent this implicit statement Jackson's message had little or no relevance.

The Attorney General next argues the message was not hearsay because it was admissible to show its effect upon Berry, i.e., causing him to delete his Facebook account after Jackson's arrest. This assumes Berry knew of Jackson's arrest, which had not been shown. In addition, the prosecutor never mentioned this rationale and did not seek to admit the message for this limited purpose. The court did not agree to admit it for a limited purpose, and, crucially, the jury was not told it was admitted for a limited purpose.

Next, the Attorney General argues the message was a party admission. As to Jackson, this is correct (Evid. Code, § 1220), but the message was not admitted as to Jackson only, but as to both defendants. As to Berry, who is challenging its admission, the statement clearly was not "offered against the declarant," and therefore does not constitute a party admission.

18

Finally, the Attorney General seemingly argues that admission of the message did not violate Berry's confrontation rights because Jackson testified. The lack of a confrontation violation, however, does not supplant the rules of evidence.

For all of these reasons, we conclude the trial court erred by admitting Jackson's Facebook message against Berry. We defer consideration of the prejudicial effect of this error until after addressing two claims of instructional error.

## 2. Erroneous accomplice instructions

The trial court instructed the jury that Byers, Berry, and Jackson were accomplices as a matter of law (CALCRIM No. 335[6]) and that "[e]xcept for the testimony of Jason Byers [and] defendants Berry and Jackson, which requires supporting evidence, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (CALCRIM No. 301.) The court also failed to instruct the jury on the definition of "accomplice."

---

[6] As given, CALCRIM No. 335 stated: "If the crimes charged were committed, then Jason Byers, defendanst [*sic*] Ewayne Berry and Dupree Jackson were accomplices to those crimes. [¶] You may not convict a defendant based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. [¶] Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

19

Defendants contend that these instructions misstated the law and violated due process by depriving them of the presumption of innocence and of a fair trial, and impairing their right to present a defense.

### a. Pertinent legal principles

A trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence, including the elements of an offense. (*People v. Acosta* (2014) 226 Cal.App.4th 108, 118.) We independently assess whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Purportedly erroneous instructions are reviewed in the context of the entire charge to determine whether it is reasonably likely the jury misconstrued or misapplied the challenged instruction. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075.) In addition, we presume that the jury followed the court's instructions. (*People v. Williams* (2010) 49 Cal.4th 405, 469.)

"Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (*People v. Fauber* (1992) 2 Cal.4th 792, 834 (*Fauber*).) The testimony of an accomplice inculpating a defendant must be corroborated by other evidence connecting the accused with the commission of the crime. (§ 1111.) Where there is substantial evidence that a witness is an accomplice, the trial court must instruct sua sponte on the corroboration requirement. (*People v. Lewis* (2001) 26 Cal.4th 334, 369 (*Lewis*).) In addition, the jury must be told that an accomplice's statement or testimony that tends to incriminate a defendant should be viewed with caution. (*People v. Guiuan* (1998) 18 Cal.4th 558, 564 (*Guiuan*).)

The required corroborative evidence need not corroborate every fact to which the accomplice testified, but is sufficient if, without assistance of the accomplice testimony, " 'it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*Lewis*, *supra*, 26 Cal.4th at p. 370.) It must relate to some act or fact that is an element of the crime, but it need not establish every element. (*People v. Williams* (1997) 16 Cal.4th 635, 680–681.) It may be slight, entirely

20

circumstantial, and entitled to little consideration when standing alone. (*Id.* at p. 681; *Lewis*, at p. 370.) A defendant's own statements and admissions may provide the required corroboration. (*Williams*, at p. 680.) However, corroborating evidence may not be supplied by, or require " 'aid or assistance' " from the testimony of another accomplice. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Evidence of mere presence and opportunity is never sufficient corroboration (*People v. Hathcock* (1973) 8 Cal.3d 599, 618 (*Hathcock*)), and evidence simply connecting the defendant with the accomplice is insufficient. (*People v. Robinson* (1964) 61 Cal.2d 373, 399.) Evidence that merely casts " ' " 'a grave suspicion upon the accused' " ' " is also insufficient. (*Ibid.*)

### b. The trial court misinstructed the jury.

The problem with the version of CALCRIM No. 301 given here is that defendants both gave self-exculpatory testimony, which is not subject to the rule of corroboration. (§ 1111; *Guiuan*, *supra*, 18 Cal.4th at p. 569 [addressing related instruction to view accomplice's testimony with caution]; *People v. Fowler* (1987) 196 Cal.App.3d 79, 87 [same, in context of testifying codefendants].) Indeed, neither defendant's testimony tended to incriminate the other.[7] As given, the instruction imposed a corroboration requirement upon all of defendants' testimony. This effectively placed a burden upon defendants to introduce corroborating evidence in order to even have the jury consider their self-exculpatory testimony, and thus violated defendants' federal constitutional rights to present a defense, to testify in their own defense, and to due process by reducing the prosecutor's burden of proof. (*Cool v. United States* (1972) 409 U.S. 100, 104; *Rock v. Arkansas* (1987) 483 U.S. 44, 49–52; *People v. Gutierrez* (2009) 45 Cal.4th 789, 821; *People v. Turner* (1990) 50 Cal.3d 668, 697 [defendant's uncorroborated exculpatory

---

[7] Berry's statement to police tended to implicate Jackson by placing him at the scene of the shooting. To that extent, Berry's statement was subject to the corroboration requirement. CALCRIM No. 335, but not CALCRIM No. 301, included extrajudicial statements within the corroboration requirement.

testimony entitled to same treatment as uncorroborated testimony of prosecution witness].)

The trial court compounded the error by instructing the jury that defendants were accomplices as a matter of law. (CALCRIM No. 335.) While Byers's testimony certainly provided support for the proposition that defendants were accomplices, the evidence and inferences to be drawn from the evidence were far from undisputed. Berry and Jackson denied playing any role in the crimes, and, as an accomplice, Byers's testimony both required corroboration and was to be viewed with caution. If the jury accepted Berry's testimony, he was not an accomplice to the crimes, and if it accepted Jackson's testimony, he was not an accomplice. The trial court's erroneous choice of CALCRIM No. 335 instead of CALCRIM No. 334, which directs the jury to determine whether a witness was an accomplice, improperly removed the determination of accomplice status from the jury. (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1271 (*Johnson*).) This was a serious error because informing the jury that defendants were accomplices as a matter of law was completely irreconcilable with each defendant's defense testimony that he did not play any role in the shooting. By giving CALCRIM No. 335, the trial court effectively negated each defendant's defense.

### 3.    Prejudicial effect of errors

Although most instructional errors are reviewed as errors of state law, the errors committed here violated defendants' federal constitutional rights to due process, to present a defense, and to testify. Accordingly, we must evaluate the error under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24: the Attorney General has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict.

The Attorney General has not met her burden. First, with respect to CALCRIM No. 301, she argues that "it is possible that the jury . . . followed the court's oral instruction and did not require supporting evidence for appellants' testimony." When the court read the instructions to the jury, it stated, "Except for the testimony of Jason Byers,

22

which requires supporting evidence . . . ." The written instructions, however, included both defendants' names in CALCRIM No. 301, as set forth above. The Attorney General's argument is pure speculation, and, while the Supreme Court made such a statement in *People v. Wilson* (2008) 44 Cal.4th 758, 804, cited by the Attorney General, it did not rest its decision on such speculation, but instead concluded that an error in the written instruction on torture was harmless because, given the evidence at trial, it would have been impossible for the jury to have found that the defendant did not intend to torture the victim. (*Ibid.*) Moreover, as the Attorney General concedes, where the oral and written instructions differ, we presume the jury followed the written instructions. (*People v. Mills* (2010) 48 Cal.4th 158, 201.)

Next, the Attorney General argues that CALCRIM No. 301 told "jurors to view a single witness's testimony with caution when used to prove a fact," but since defendants "did not need to 'prove any fact' with their self-exculpatory testimony," and jurors were repeatedly instructed that the prosecution carried the burden of proof, "instructing the jurors that appellants' testimony required supporting evidence to prove a fact was immaterial." We reject this construction. First, CALCRIM No. 301 did not tell jurors to view a single witness's testimony with caution. It did, however, expressly tell jurors that the testimony of Berry and Jackson required "supporting evidence," i.e., corroboration. Notwithstanding instruction upon the burden of proof and other instructions, reasonable jurors reading the version of CALCRIM No. 301 given here could only conclude that defendants' testimony had to be corroborated before it could be used to prove any fact. That is what the instruction says, and it is not reasonably likely that jurors engaged in the complex interpretation urged by the Attorney General.

Next, the Attorney General argues the error in CALCRIM No. 301 was harmless because defendants' testimony was corroborated. She argues that, as to Jackson, "Berry's testimony that he ran into Byers and Hilt—not appellant Jackson—right before the shooting and that Hilt told him to go down the street" supported Jackson's testimony. Indeed, it did. However, jurors were instructed, in accordance with the law, that "[t]he

23

evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice." (CALCRIM No. 335.) Thus, presuming that jurors followed the instructions, they could not have considered Berry's testimony as corroboration for Jackson's testimony. The same problem undermines the Attorney General's argument that testimony by accomplice Byers to the effect that Byers and Hilt were present and involved in the shooting provided support for Berry's testimony.

With respect to CALCRIM No. 335, the Attorney General argues that instructing the jury that defendants were accomplices if the charged crimes were committed was harmless because the jury was repeatedly instructed on the prosecution's burden of proof, which did not include proving that defendants were accomplices, just that they were guilty of murder and conspiracy to murder. However, the prosecution relied upon a theory that defendants were accomplices (as conspirators or aiders and abettors), and instruction upon the prosecutor's burden of proof did not counteract the clear statement in CALCRIM No. 335 that "[i]f the crimes charged were committed," defendants were accomplices to those crimes. Thus, if the jury found anyone committed the charged crimes, whether it was Byers and Hilt, Byers and Jackson, or Byers and Berry, under the terms of CALCRIM No. 335, which we presume the jurors followed, both defendants were accomplices to those crimes, meaning, at a minimum, that their self-exculpatory testimony required corroboration.

Because someone—assisted by Byers—clearly shot Genis, it was clear, at a minimum, that a homicide was committed. The jury clearly found that the homicide was murder and that there was a conspiracy to commit murder. Given the absence of any instruction defining "accomplice" for the jury, it is unclear whether the jury would have understood that accomplices are persons subject to prosecution for the same offense, which is a technical, legal meaning that differs from its significantly broader ordinary meaning of "one associated with another esp[ecially] in wrongdoing." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 7.) It is clear, however, that jurors would

24

reasonably construe CALCRIM No. 335 and its statement that defendants and Byers were accomplices to mean that defendants were somehow associated with or involved in the crimes, which inherently impaired the presumption of innocence and negated the defendants' testimony that they were not involved. Other instructions informed jurors that defendants could be found guilty based upon aiding and abetting or conspiracy theories. Jurors may have correctly assumed that an aider and abettor or conspirator was an "accomplice." We need not speculate, however, because the Attorney General bears the burden of proving that the error was harmless beyond a reasonable doubt, and, given the very uncertainty of how the jury would have understood the effect upon defendants' liability of the court's instruction that they were accomplices, the Attorney General has failed to carry her burden.

With respect to CALCRIM No. 335, the Attorney General also relies upon *Johnson*, *supra*, 243 Cal.App.4th 1247. There, the appellate court concluded the trial court erred by giving CALCRIM No. 335, but in light of the evidence, the error was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, i.e., the defendants were required to demonstrate a reasonable probability that the jury would have found that they were not accomplices if the court had used the proper instruction, CALCRIM No. 334. (*Johnson*, at p. 1271.) Here, because the instructional errors impaired defendants' constitutional rights, we apply the *Chapman* standard, which is not only more exacting, but places the burden upon the Attorney General to demonstrate harmlessness, not upon the defendants to demonstrate prejudice.

Moreover, in *Johnson*, there was only one erroneous accomplice instruction, whereas here the court erroneously informed the jury that each defendant's testimony required corroboration, thereby creating a significant obstacle to the jury's consideration and possible acceptance of defendants' testimony. As an aspect of its prejudice analysis, the *Johnson* court noted that nothing in CALCRIM No. 335 or the record directed the jury to view the defendants' "testimony under anything other than the usual rules for evaluating a witness's credibility." (*Johnson*, *supra*, 243 Cal.App.4th at p. 1275.)

25

A number of other factors also distinguish *Johnson* from the present case. In *Johnson*, a group of four men arrived together at a lakeside campground. Two or three of them immediately jumped out of the car and attacked people, while defendant Johnson got out, grabbed his wife, who had been staying at the campground with the victims, and attempted to drag her into the attackers' car. At the conclusion of the attack, all four men fled together in the car. A number of people at the campsite, including the surviving victim, knew Johnson and one or more of the other attackers. The surviving victim, Johnson's wife, and other percipient witnesses to the attack testified at trial regarding the homicide, attempted homicide, and the role played by each man in the group of attackers. In addition, in the weeks preceding the attack, Johnson had threatened to kill his wife and the attempted homicide victim. (*Johnson*, *supra*, 243 Cal.App.4th at pp. 1252–1255.)

Each defendant in *Johnson* made extrajudicial admissions. Johnson admitted driving the others to the lake and knowing they planned to rob someone when they arrived at the lake. Thornton admitted that he was involved in a plan to rob people at the lake. Both defendants testified at their trial. Thornton testified that he and Johnson remained in or at the car during the attacks and claimed he knew of no criminal plan. Johnson testified he agreed to give the other three men a ride to the lake, knowing they intended "'to do something,'" and that in route he heard talk about robbing someone and he "might have heard about" a gun. (*Johnson*, *supra*, 243 Cal.App.4th at pp. 1255–1265.)

Thus, in *Johnson*, the defendants' guilt did not rest solely or even principally on the testimony or extrajudicial admissions of an accomplice, let alone an accomplice who accepted a prosecution plea agreement in exchange for his testimony. The testimony of the percipient witnesses, as well as the defendants' admissions formed the bulk of the prosecution's case against them. As the appellate court concluded, "there was overwhelming evidence that both Johnson and Thornton" knew the other two men intended to attempt to rob people at the lake and intentionally facilitated that attempt. In light of that "overwhelming evidence," the "defendants' testimony that they did not

26

intend to facilitate the robbery was simply not credible." (*Johnson*, *supra*, 243 Cal.App.4th at p. 1273.)

Here, there were no testifying percipient witnesses other than Byers. Byers was an accomplice in the crimes whose testimony the jury was properly told should be viewed cautiously. Parts of his testimony were self-contradictory and other parts were rather implausible. For example, Byers initially testified that Berry approached him about 30 minutes after the school group passed the Stoners house, they talked, then Berry left, then returned while Byers was talking to Jackson and Hilt, and at that time Byers told Berry about what had happened. On cross-examination, however, Byers repeatedly testified that the first time he saw Berry that day was when Berry approached while Byers was talking to Jackson and Hilt. Similarly, Byers initially testified that when the incident with the Stoners occurred, he had not yet met up with Jackson, but on cross-examination he testified that Jackson was part of the group that had walked past the Stoners house that day with Byers and suffered abuse. When asked about and shown his contradictory police statement, Byers testified Jackson was not part of the group. Byers also testified that the plan to attack the Mid City Stoners house was discussed, but he did not know who picked Berry to be the shooter. Similarly, he testified he did not recall who, among them, told him to take the shooter to the Stoners house using the bicycle Byers had conveniently found lying next to the curb. After being shown a transcript of his recorded statement to the police, he testified it was Jackson. Later, on cross-examination, Byers testified no one told him to do that, he just felt he should do it. Byers also testified that "we hid" the gun but did not know who did so or where.

Byers also had an obvious motive to fabricate, in that he had been facing an indeterminate term of 25-years-to-life but was given a 13-year sentence in exchange for his testimony against Berry and Jackson. In addition, Hilt was his friend, and he therefore had a motive to shift blame from Hilt to defendants. Notably, Byers testified that he and Hilt had previously discussed the offensive conduct of the Mid City Stoners and, on December 21 they said, in effect, "enough is enough." In addition, Rosales's testimony

27

tended to implicate Hilt as the shooter because he testified that the boy in the red shorts (Hilt) was at the corner of 113th Street and Wadsworth and warned him not to continue on 113th Street. The corner of Wadsworth and 113th Street was the location where Byers testified Berry got off the bicycle and Byers waited for him to commit the shooting. According to Byers, Hilt and Jackson had waited more than 100 yards farther east on 113th Street, toward Belhaven.

Berry's motive for participating—especially as the actual shooter—was also subject to doubt, since he did not live in that neighborhood and, as far as the evidence reveals, never lived in that neighborhood and only visited it occasionally. He therefore would not have walked past the Stoners house and suffered their abuse. He associated with a different gang that was not on friendly terms with the Bounty Hunters gang that claimed the neighborhood and was engaged in conflict with the Stoners. And, of course both Berry and Jackson testified and told the police that they were not participants in the shooting or a plan to shoot anyone. The prosecution's case was therefore far weaker than in *Johnson*, and it rested almost entirely on Byers's testimony.

Apart from Byers's testimony, the prosecution's case against Berry consisted of the presence of his shoe and purported inconsistencies between his testimony and his statement to the police, most notably about the location of his shoe. Berry explained why he lost his shoe and was present in the neighborhood, and it is unclear from the record that Berry actually changed the location of the shoe, as opposed to Kouri mismarking a tiny, not-to-scale map. It simply cannot be said on this record that there was no reasonable doubt that Berry was an accomplice in the crimes, so as to render the error in instructing with CALCRIM No. 335 harmless beyond a reasonable doubt. Moreover, the effect of giving CALCRIM No. 335 was exacerbated by the trial court's other errors of erroneously telling the jury that each defendant's testimony required "supporting evidence" and improper admission of highly prejudicial and inadmissible hearsay that the prosecution utilized as an assertion by Jackson that Berry was the shooter.

28

As to Jackson, the prosecution's case apart from Byers's testimony was stronger, in that Rosales identified Jackson as a member of the group of four behind Rosales's car, although, as previously described, his testimony was somewhat confusing, in that he seemingly mixed up several of the boys. Moreover, Rosales did not identify Jackson as one of the two who appeared to be loading a gun. Berry implicated Jackson in his police statement, but explained at trial that this was to protect Hilt. In addition, Berry's statement implicating Jackson had to be viewed with caution because Berry was an accomplice. The most damning evidence against Jackson was his own Facebook message, for which his explanation at trial was not persuasive. While this evidence creates a suspicion that Jackson was an accomplice, the evidence simply was not undisputed. Moreover, as with Berry, the prejudicial effect of giving CALCRIM No. 335 was exacerbated by the trial court telling the jury that each defendant's testimony required "supporting evidence," thereby virtually guaranteeing that the jury disregarded Jackson's testimony.

On the whole, we cannot say that the evidence against either defendant was so strong, persuasive, or one-sided as to permit this court to conclude that there is no reasonable possibility that the errors might have contributed to the verdicts. (*People v. Aranda* (2012) 55 Cal.4th 342, 367.) We therefore conclude that the Attorney General failed to meet her burden of proving harmlessness beyond a reasonable doubt, and we reverse the convictions.

Given our disposition, we need not address any other issues raised on appeal, but we briefly note that if defendants are retried on the conspiracy charge, the trial court should not ask the jury to determine the degree of the murder they conspired to commit because every conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237–1238.)

## DISPOSITION

The judgments are reversed.

NOT TO BE PUBLISHED.

LUI, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.